**FIRST DIVISION**
January 22, 2008

No. 1-05-1006

| | | |
|---|---|---|
| DEVONNA BEARD, Special Administrator of the Estate of Vernestine Hudgins Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| JOHN T. BARRON and RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, | ) ) ) | No.  01 L 014065 |
| Defendants-Appellees | ) ) ) | |
| (Hesham Hassaballa, | ) ) | The Honorable Deborah Mary Dooling, |
| Defendant). | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

On November 4, 1999, Vernestine Hudgins died of renal failure associated with Stevens-Johnson syndrome, a painful condition where large blisters form on the skin caused by a hypersensitive reaction to medication.  Her daughter, the plaintiff Devonna Beard, filed suit against Hudgins's cardiologist, Dr. John T. Barron, and Rush-Presbyterian-St. Luke's Medical Center (Rush)[1] through its agents, Dr. Hesham

---

[1] Rush-Presbyterian-St. Luke's Medical Center is now known

Hassaballa and Dr. Barron, alleging medical negligence. The plaintiff's theory was that Drs. Barron and Hassaballa failed to timely detect a bleed in Hudgins's brain, a subdural hematoma, that caused Hudgins to fall into a state of constant seizures, <u>status</u> <u>epilepticus</u>, that in turn required the administration of Dilantin, an antiseizure medication. According to the plaintiff, Dilantin caused Hudgins's Stevens-Johnson syndrome, which eventually led to renal failure, causing her death. The jury returned a verdict in favor of the defendants.

The plaintiff contends on appeal that the circuit court committed three reversible errors: (1) the trial court misapplied the Dead-Man's Act (735 ILCS 5/8-201 (West 2004)) when it reserved ruling on the plaintiff's motion <u>in</u> <u>limine</u> seeking to bar Dr. Barron from testifying about claimed conversations he had with Hudgins regarding prior headaches; (2) the trial court overruled the plaintiff's objection to the defendants' cross-examination of Dr. William Greenlee as beyond the scope of direct examination; and (3) the trial court refused to give instructions pursuant to Illinois Pattern Jury Instructions, Civil, Nos. 30.21 (aggravation of preexisting condition) and 30.23 (injury from subsequent treatment) (2005). The plaintiff argues that the

as Rush University Medical Center.

errors could have affected the jury's verdict.  We affirm.

BACKGROUND

In early July of 1999, Vernestine Hudgins was an active 65-year-old woman.  She enjoyed cooking for her several adult children, attending church outings, shopping, and traveling. Hudgins also suffered from numerous cardiac conditions, some of which required that she be hospitalized several times a year. Hudgins had congestive heart failure and severe pulmonary hypertension, both of which were progressing.  She also had massive edema (swelling in her legs and abdomen), and fluid on her lungs.  Hudgins had an irregular heartbeat attributed to atrial fibrillation.  She was taking several medications, including the diuretics Lasix and Zaraxolyn, and blood pressure medications, including Digoxin and Lisinopril.

Hudgins also had been receiving anticoagulation therapy (blood thinners) since 1983, when the mitral valve of her heart was replaced with a mechanical one.  Because blood can clot around mechanical valves, Hudgins took blood thinners to help reduce her chances of a stroke.  In July 1999, her life expectancy was three to five years.

On July 6, 1999, Hudgins was admitted to Rush for a scheduled cardiac catheterization procedure to evaluate her aortic valve that had started leaking.  Rush, a teaching

3

hospital, uses an approach where a supervising doctor, the attending physician, oversees fellows, residents, and interns. The attending physician during Hudgins's July 6 admission was Dr. Barron, a cardiologist who had been Hudgins's physician since 1988. Hudgins was also treated by Dr. Ajay Baddi, a cardiac fellow, and Dr. Hassaballa, an intern.

Because the cardiac procedure involved inserting a catheter into the artery near her groin, the anticoagulation therapy had to be halted before the procedure was performed. At the time of her admission, Hudgins was taking the blood thinner Coumadin, which remained active in her system for several days. In order to ensure that Hudgins's blood remained adequately anticoagulated, Coumadin was stopped and Heparin, a blood thinner that would remain in Hudgins's system for only a few hours, was introduced. The idea was that Heparin would be stopped a few hours before the cardiac catheterization procedure began and restarted once the procedure was over. Hudgins would later transition back to Coumadin.

Hudgins also received a drug called Norvasc, used to treat high blood pressure.

Hudgins's cardiac catheterization procedure was performed on July 9, 1999. She remained at Rush for several days thereafter while doctors adjusted her blood thinners to a therapeutic level.

4

On July 10, Dr. Baddi performed a brief neurological exam that was normal and reported in Hudgins's chart that she had no new complaints.  Dr. Baddi made similar entries in her chart for July 11 and 12.

On July 12, 1999, Hudgins suffered a nosebleed and a headache.  On July 13, she had another nosebleed and headache.  She was given Tylenol and a medication called Ultram.  On the evening of July 13, Hudgins declined further pain medication, but requested an ice pack for her headache.

On July 14, 1999, Hudgins vomited twice.  As a result, she was given the drug Compazine.  She also experienced a 47-point drop in her systolic blood pressure and a 23-point drop in her diastolic blood pressure.  A nurse's note entered at 4:40 p.m. indicated that Hudgins denied any complaints, was oriented to person, place, and time, opened her eyes to sound, had clear and appropriate speech, and obeyed commands.

On July 17, 1999, Hudgins's headache returned.  As a result, Dr. Barron stopped the medication Norvasc.  Hudgins did not report a headache for the rest of the day on July 17 or on July 18 or 19.

Although her blood-thinning levels were not quite where Dr. Barron wanted them to be, Hudgins was discharged from Rush on July 19, 1999.  Prior to being discharged, she was instructed on

giving herself an injection of a fast-acting anticoagulant called Lovenox. She was also placed back on Coumadin. According to members of Hudgins's family, she complained of a headache and appeared groggy upon discharge.

Hudgins was taken to the emergency room (ER) at Rush on the morning of July 20, 1999, because her groin wound from the cardiac catheterization procedure began bleeding. Dr. Barron met Hudgins in the ER and applied pressure to the wound. Hudgins was readmitted so an ultrasound could be performed on the groin area to detect whether she had a pseudoaneurysm. Coumadin was briefly stopped. Once the ultrasound came back negative, Coumadin was restarted. Hudgins was seen by Dr. Hassaballa, who noted that Hudgins was not experiencing any chest pain, dizziness, or double vision, but that she was "[p]ositive for headache started in house on last admission." She was again given Ultram.

On the morning of July 21, 1999, while still at Rush, Hudgins continued to report a headache, was nauseated, and vomited twice. At 7:20 a.m., Dr. Hassaballa ordered Compazine to relieve the nausea and vomiting. When Hudgins was discharged from Rush at 5 p.m. on July 21, she had a "mild" headache and was drowsy. Hudgins declined Tylenol for her headache. Her drowsiness was attributed to Compazine.

Hudgins returned home, where she continued to experience a

headache.  In the early morning of July 23, 1999, one of Hudgins's daughters called 911 because she began turning her head from side to side and appeared groggy.  When the paramedics arrived, Hudgins's eyes were rolled back, indicative of a seizure.  She was taken to Westlake Hospital (Westlake), where a computed tomography (CT) scan was performed upon her admission.  The CT scan showed a subdural hematoma and indicated she was in status epilepticus.  Additional CT scans were performed during her hospitalization at Westlake.

Doctors at Westlake treated Hudgins intravenously with Dilantin, used to control seizures.  She remained in status epilepticus for about four days and fell into a coma.  On July 28, 1999, Hudgins was transferred to Rush, where Dilantin was continued.  Hudgins's seizures eventually stopped, allowing her to be sent to rehabilitation.  However, the seizures soon returned.  In early September, Hudgins developed a rash that soon turned into open, oozing sores on her back, buttocks and thighs.  The sores, about the size of apples, would fill with fluid and burst.  It was evident to Hudgins's children, who frequently visited, that she was in pain.  Hudgins's daughters took turns staying with her through the night.

It was determined that Hudgins had developed Stevens-Johnson syndrome.  She also developed pneumonia and her kidneys began to

7

fail.  Hudgins died on November 4, 1999, at the age of 66.

The plaintiff filed suit against Dr. Barron, Dr. Hassaballa, and Rush,[2] alleging medical malpractice.  Dr. Hassaballa was later dropped as an individually named defendant.

A jury trial commenced on September 23, 2004.  The plaintiff's theory was that the standard of care required the defendants to order a neurological consult of Hudgins on July 17, 1999, as well as a CT scan by July 20 or 21.  According to the plaintiff, Hudgins's nausea, nosebleeds and headaches, combined with her anticoagulation therapy, should have placed the doctors on notice that she was experiencing bleeding in her brain.  According to the plaintiff, if the bleeding had been detected prior to status epilepticus setting in, it could have been controlled without the administration of Dilantin, which she contended, caused the Stevens-Johnson syndrome.  The plaintiff's experts opined at trial that had the subdural hematoma been treated before the seizures developed, the subsequent complications would not have arisen and Hudgins would not have died when she did.

As her initial witness, the plaintiff called Dr. Barron to

---

[2] The plaintiff's original complaint named other defendants not relevant to this appeal.

testify as an adverse witness. The medical charts of Hudgins's July 6, 1999, admission were also admitted into evidence. To support her theory that Hudgins's brain was bleeding while she was still at Rush, the plaintiff presented expert testimony from Dr. Mary Edwards-Brown, a neuroradiologist and professor of radiology at Indiana University. Dr. Edwards-Brown reviewed several images of Hudgins's brain, including CT scans taken on July 23 and July 28, 1999, at Westlake and a magnetic resonance imaging (MRI) scan taken at Rush on July 29. It was Dr. Edwards-Brown's opinion that, within a reasonable degree of medical certainty, Hudgins's hematoma was in the early subacute phase, meaning the majority of the bleeding occurred within two days to a week before the July 29 MRI. However, the images also indicated the bleeding had occurred over time. Dr. Edwards-Brown concluded that some of the hematoma was in the late subacute phase, meaning it occurred as much as two months prior to the MRI. Because Hudgins's clinical history indicated she was on anticoagulants, experienced bleeding from her nose and groin wound, and suffered headaches, Dr. Edwards-Brown opined the bleeding likely began when Hudgins reported her first headache on July 12.

The plaintiff also presented the jury with the videotaped deposition of Dr. William Greenlee, a neuroradiologist. Dr.

Greenlee testified that the July 29, 1999, MRI taken at Rush indicated Hudgins's bleed occurred several days to several weeks prior to the scan. On cross-examination, Dr. Greenlee testified that when looking at the July 29, 1999, MRI and a July 28, 1999, CT scan together, his opinion was that the age of the bleed was in the "several days to a week period."

Dr. Robert Heller, a board-certified internist from Los Angeles, and Dr. Omkar Markand, the Professor Emeritus in the neurology department at Indiana University, also testified as experts on behalf of the plaintiff. Both doctors based their opinions, in part, on the records of Hudgins's 1999 admissions to Rush and Westlake.

Dr. Markand testified that the standard of care required Dr. Barron to do more than just take Hudgins off Norvasc on July 17, 1999. Because Hudgins had experienced nosebleeds, headaches, nausea, and vomiting, Dr. Barron should have requested a neurological consult and probably should have obtained a CT scan of Hudgins's head. Dr. Markand testified that because Hudgins's symptoms were present during her July 20, 1999, admission to Rush, the standard of care required both a neurological consult and a CT scan on July 20 and no later than the morning of July 21. Dr. Markand also testified that Hudgins developed Stevens-Johnson syndrome from receiving Dilantin. In his opinion, had

10

Hudgins's subdural hematoma been detected by July 21 and immediately treated, she would not have developed <u>status epilepticus</u>, would not have required Dilantin, and would not have developed Stevens-Johnson syndrome.

It was Dr. Heller's opinion that Dr. Barron's treatment fell below the standard of care because he ignored Hudgins's symptoms of headache, nausea and vomiting, and did not properly evaluate those symptoms in light of her anticoagulation therapy by ordering a neurological consult or a CT scan of her head.  Dr. Heller also opined that Dr. Hassaballa's treatment fell below the standard of care because he failed to properly report Hudgins's symptoms of intracranial bleeding to Dr. Barron, his attending physician, and failed to properly evaluate Hudgins with either a neurological consult or a CT scan.

The defendants presented expert testimony from Dr. Albert Ehle, a neurologist and professor of neurology at the University of Chicago, Dr. Joel Meyer, a neuroradiologist with Evanston Northwestern Health Care, and Dr. Dan Fintel, a cardiologist at Northwestern.  Drs. Barron and Hassaballa also testified for the defense.

According to Dr. Meyer, the July 23, 1999, CT scan of Hudgins's brain indicated the hematoma was acute, meaning it had occurred within hours or up to one or two days prior to the scan.

11

Dr. Hassaballa and Dr. Barron each testified that his respective care of Hudgins met the applicable standard of care. Dr. Barron testified that Hudgins's nosebleeds and headaches were not significant because she had experienced them before. He also testified that because Compazine resolved Hudgins's vomiting, this was "strong evidence" that the vomiting was not "cephal in origin."

Dr. Ehle testified that the standard of care did not require either a neurological consult or a CT scan on July 17, 1999, when Norvasc was discontinued. In his opinion, there was "no evidence" that the plaintiff had the kind of "persistent, progressive headaches" that are symptomatic of a subdural bleed during her first admission to Rush. Dr. Ehle also testified that the standard of care did not require either a neurological consult or a CT scan during Hudgins's second admission to Rush. Dr. Ehle also found it "significant" that Hudgins was "well-known to the service [provider]" and accordingly her doctors, including Drs. Barron and Hassaballa, would be "sensitive to any subtle changes in her behavior that could have been an indication of something going on." According to Dr. Ehle, the Stevens-Johnson syndrome could have been caused by antibiotics Hudgins received, as well as by Dilantin.

Dr. Fintel testified that in his opinion, the standard of

care did not require either a neurological consult or a CT scan during Hudgins's first or second admission to Rush. According to Dr. Fintel, clinical signs of a subdural hematoma include a persistent change in mental status, the inability to follow commands, clumsiness, neurological abnormalities, and severe persistent headaches that do not respond to drugs and intensify over time. According to Dr. Fintel, Hudgins did not experience any of these symptoms while at Rush. Dr. Fintel also testified that the complications Hudgins experienced following the subdural bleed were "inevitable and unavoidable" as well as "not predictable."

The jury returned a verdict in favor of the defendants, and the circuit court entered judgment on the verdict. The plaintiff's posttrial motion was denied, and this timely appeal followed.

## ANALYSIS

### I. Dead-Man's Act

In keeping with her theory that Dr. Barron and Dr. Hassaballa failed to recognize Hudgins's headaches as symptomatic of a bleed in her brain, the plaintiff filed two motions in limine seeking to prevent Dr. Barron from testifying that Hudgins had experienced headaches in the past. It was the plaintiff's theory that such testimony would violate the Dead-Man's Act (the

Act) (735 ILCS 5/8-201 (West 2004)).  The trial court ruled it was required to first determine under <u>Hoem v. Zia</u>, 159 Ill. 2d 193, 636 N.E.2d 479 (1994), whether the plaintiff's experts would "open the door" to any prior conversations or events between Dr. Barron and Hudgins before deciding whether any prior conversations were admissible.  The court stood by its ruling even after being informed Dr. Barron would be the first witness to testify.

Although the plaintiff contends otherwise, the issue in this case turns on the nature of the evidence presented regarding any prior conversations between Hudgins and Dr. Barron.  It is therefore an evidentiary issue, not an issue of statutory construction.  Accordingly, we review the trial court's ruling for an abuse of discretion.  <u>In re Estate of Hoover</u>, 155 Ill. 2d 402, 420, 615 N.E.2d 736 (1993).

The Dead-Man's Act provides, in relevant part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the

14

presence of the deceased \*\*\*, except in the following circumstances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased \*\*\* or to any event which took place in the presence of the deceased \*\*\*, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event."  735 ILCS 5/8-201(a) (West 2004).

Our supreme court has explained that the Act serves two purposes: (1) protecting decedents' estates from fraudulent claims; and (2) equalizing the position of the parties in regard to the giving of testimony.  Gunn v. Sobucki, 216 Ill. 2d 602, 609, 837 N.E.2d 865 (2005), citing Hoem, 159 Ill. 2d at 201; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §606.1, at 334 (8th ed. 2004).

The plaintiff argues the trial court's decision to reserve ruling on her motions permitted Dr. Barron to inject his prior experiences with Hudgins and to testify about conversations with her involving prior headaches.  She complains about five specific instances in the examination of Dr. Barron in support of her claim.

The first three instances transpired when Dr. Barron was called as an adverse witness in the plaintiff's case-in-chief. Dr. Barron testified that he had been Hudgins's doctor since 1989, and he gave a history of the numerous ailments from which Hudgins suffered. He also explained Hudgins's transitions from Coumadin to Heparin and back to Coumadin during her July 6, 1999, admission to Rush. Dr. Barron acknowledged that during the period of transition, Hudgins was at a greater risk for bleeding and for suffering a stroke. He acknowledged that a headache could be a sign of brain-related bleeding. A nosebleed, however, was not, by itself, a sign of brain-related bleeding. Dr. Barron testified that a nosebleed was not necessarily a sign of spontaneous bleeding and explained that nosebleeds could be caused by irritation from several sources. Dr. Barron also testified that Hudgins reported nosebleeds in the past, although he did not recall charting any of those nosebleeds. Dr. Barron acknowledged that he learned Hudgins was suffering headaches during the July 6, 1999, admission, but he would not necessarily report his evaluation of those headaches in her chart. He also testified that he responded to her headaches by taking her off Norvasc on July 17. He additionally acknowledged that the easiest way to determine whether headaches were due to bleeding in her brain was with a CT scan.

The plaintiff questioned Dr. Barron about his progress notes of Hudgins's first admission to Rush, which were admitted into evidence. When asked why his progress notes did not discuss his evaluation of Hudgins's headaches, Dr. Barron explained his neurological exams were not necessarily written, but that he evaluated her speech, mentation and motions every time he saw her. He further explained that he only recorded "important factors." The first instance in Dr. Barron's testimony that the plaintiff contends violated the Dead-Man's Act then occurred.

"Q. Was it not important on July 16th that Mrs. Hudgins had had headaches during the days prior to that?

A. [Mrs.] Hudgins had headaches in the past as well, frequent headaches in the past. My conversations with her for the past ten years --

MS. THOMAS [Plaintiff's Attorney]: Move to strike, Your Honor.

THE COURT: It's stricken. The jurors are instructed to disregard the answer. Dr. Barron, just respond to the question asked.

          ***

THE WITNESS [Dr. Barron]: In my judgment

17

it was not."

The second instance transpired after counsel for the plaintiff asked Dr. Barron to read the note he made in her chart on July 17, 1999, when Norvasc was discontinued.

"A. [Dr. Barron]: It says Cardiology. Vital signs stable, which is VSS. *** Patient doing well except complains of headache. Dieresis continues. Exam, less edema. Plan, DC Norvasc. Number 2, check PT today. If INR of 2.0, may DC home on 7.5 milligrams PO, which means by mouth, every ghs, which means at night. Coumadin. Then I signed it.

Q. That's the extent of your note --

A. Yes.

Q. -- on the 17th? And this is what we discussed earlier this morning where in response to plaintiff's headaches during this admission, you ordered that she be discontinued from Norvasc?

A. Are you referring specifically to the 17th or to the 13th when it was held?

Q. The 17th.

A. Specifically the 17th she told me

that --

[MS. Thomas]: Your Honor, motion in limine.

\*\*\*

THE COURT: Start another question. Strike all that. Just start another question. And wait for the question. If you don't understand, say I don't understand. If you do, just answer the question asked. Go ahead.

Q. Mrs. Hudgins, her Norvasc was discontinued on the 17th, correct?

A. Permanently discontinued, yes."

On the above record, we find no error to have occurred. The plaintiff's timely objections, sustained by the trial court, kept any offensive testimony from the jury. To the extent Dr. Barron's answer referenced an improper subject, the trial court properly instructed the jury to disregard the testimony. The jury is presumed to follow the trial court's instructions. People v. Taylor, 166 Ill. 2d 414, 438, 655 N.E.2d 901 (1995). Consequently, any error that may have occurred was cured.

The plaintiff, in effect, argues that had her motions in limine been granted prior to Dr. Barron taking the stand, no risk

19

to the plaintiff of Dr. Barron testifying to such matters would have occurred. A grant of the motion in limine would have obviated any need of the plaintiff having to object and avoid giving the jury the impression that she was trying to hide evidence.

As this court noted in Compton v. Ubilluz, 353 Ill. App. 3d 863, 871, 819 N.E.2d 767 (2004), trial courts are at a disadvantage in ruling on motions in limine because such motions are "considered in a vacuum, before the presentation of the full evidence at trial that may justify admission or require exclusion." Here, we cannot say the trial court abused its discretion by waiting until Dr. Barron actually testified in order to determine whether the plaintiff would open the door to any testimony that would otherwise be prohibited by the Act. The better approach may have been to grant the motion subject to reconsideration had the door been opened. However, no reversible error occurred where the trial court sustained the timely objections. See, e.g., Crumpton v. Walgreen Co., 375 Ill. App. 3d 73, 84, 871 N.E.2d 905 (2007) (to the extent any prejudice occurred by the defendant's violation of the motion in limine, "it was cured by the circuit court's instruction to the jury to disregard counsel's question").

The third instance of which the plaintiff complains happened

when Dr. Barron, still testifying as an adverse witness in the plaintiff's case, was asked about Hudgins's symptoms on July 20, 1999, when she returned to Rush after her groin wound began bleeding.

"Q.  And you knew she came in, and she was having headaches on the 20th when she came in with her groin bleed, correct?

A.  When she -- not on the day that she came in on the 20th.  I did not know that. And she did not report this to me.  And I had no indication that she did have headaches that morning.

Q.  But by the time you signed the discharge note and the order on the morning of the 21st, it was clear that she had had headache yesterday and she was having headache, nausea, and vomiting in the morning, correct?

A.  Yes.

Q.  You knew that?

A.  Yes.

Q.  Yet that was not enough for you to order a CT scan?

A.   Because she had it several times
before and in previous admissions as well.

MS. THOMAS: Move to strike.

THE COURT: No.  Based on your question
overruled.  It will stand."

The plaintiff relies on Vazirzadeh v. Kaminski, 157 Ill. App. 3d 638, 510 N.E.2d 1096 (1987), and Theofanis v. Sarrafi, 339 Ill. App. 3d 460, 791 N.E.2d 38 (2003), to argue this testimony was improper.

In Vazirzadeh, the issue was whether the defendant doctor failed to diagnose and treat the decedent's symptoms of a pulmonary embolism.  The decedent's symptoms, including shortness of breath and chest pain, were not disputed.  The defendant doctor, while testifying as an adverse witness in the plaintiff's case, testified, in response to questions from his own attorney, that the decedent told him that his chest pain was of short duration, was relieved by belching, and was not significant.  On appeal, this court held that the testimony was barred by the Act, as the plaintiff had not questioned the defendant about that conversation between the doctor and the decedent.  Vazirzadeh, 157 Ill. App. 3d at 645.

Theofanis also involved the situation where the defendant doctor was cross-examined by his own attorney after being called

22

as an adverse witness in the plaintiff's case. There, the defendant doctor sought to testify to a conversation with the decedent about which the plaintiff's attorney had not asked.

In this case, unlike in <u>Vazirzadeh</u> or <u>Theofanis</u>, the complained-of testimony was elicited by the plaintiff's own attorney during an adverse examination. One of the objectives of the Act is fundamental fairness. <u>Wasleff v. Dever</u>, 194 Ill. App. 3d 147, 153, 550 N.E.2d 1132 (1990). This purpose is not fulfilled where, as in this case, the plaintiff is permitted to elicit testimony from the defendant medical doctor during an adverse examination insinuating that he missed important symptoms exhibited by his patient, while, at the same time, denying him the opportunity to answer questions, posed by the plaintiff, as to why he did not find these symptoms significant to warrant further testing. Our supreme court has noted:

> "It would be palpably unjust if a litigant
> were permitted to call an adverse party and
> examine him as to one fact or phase of a
> transaction in his favor and then invoke the
> bar of the statute when the party examined
> sought to testify further with regard to the
> same transaction for the purpose of
> explaining his former testimony or correcting

23

> an erroneous impression left thereby."
>
> Perkins v. Brown, 400 Ill. 490, 497, 81
>
> N.E.2d 207 (1948).

We recognize that the court in Perkins was interpreting a prior version of the Dead-Man's Act which dealt with "conversations" or "transactions" while the current Act discusses "conversations" or "events."  Compare Vazirzadeh, 157 Ill. App. 3d at 644, with Zorn v. Zorn, 126 Ill. App. 3d 258, 261-63, 464 N.E.2d 879 (1984) (each case taking a different view as to the legislature's intent by the change in language).  Nonetheless, we determine, given the facts of this case, that it would be fundamentally unfair to allow the plaintiff to specifically ask Dr. Barron why he did not order a CT scan on July 21, the question suggesting that Hudgins presented with symptoms that were new and concerning, and then use the Dead-Man's Act to bar his response why he did not feel the symptoms to be new or concerning.

The last two instances of which the plaintiff complains transpired during Dr. Barron's direct examination in the defendants' case-in-chief.

> "Q.  Did she, over the years, ever have
> nose bleeds?
>
> A.  She had several nose bleeds.

24

> Q. Did she, over the years, have
> complaints of headache that she at least felt
> was due to hypertensive medication?
>
> MS. THOMAS: Objection, motion in
> limine."

The parties then discussed the matter outside of the presence of the jury. Counsel for the plaintiff argued that there were no reports of prior headaches in any of the charts admitted into evidence. Counsel also explained that defense counsel had produced two notations of headaches in Hudgins's medical records that had not been admitted, one from 1992 and the other from 1995. The plaintiff's attorney argued that she had not opened the door to any records prior to Hudgins's July 6 admission, and consequently, any testimony regarding headaches preceding that date should be barred. The court ruled:

> "This is what I'm going to do on this.
> Dr. Barron is going to be limited -- saying
> you are tracking on the Dead Man's Act as to
> the conversation. Dr. Barron is going to be
> limited to talking about any headaches that
> there is actually a record of on a prior
> treatment of Ms. Hudgins. Whether it's in
> his medical chart or some other chart, if it

25

was recorded at the time, then Dr. Barron can talk about it."

When Dr. Barron's testimony resumed, the following occurred.

"Q. *** Doctor, while she was on the medications that you told me about, did the patient have complaints of nose bleeds?

A. Yes.

Q. Did the patient have complaints of headache?

A. Yes.

Q. Did the patient have complaints of nausea and vomiting?

A. Yes.

Q. Was Tylenol given for the headaches?

A. Yes.

Q. In dealing with congestive heart failure patients, you know and have an understanding of what side effects all of the medications that patients such as Ms. Hudgins can have from those medications?

A. Yes."

The plaintiff asserts this ruling, too, was erroneous. We disagree. We find the supreme court's decision in <u>Hoem</u>, 159 Ill.

26

2d 193, instructive.

In Hoem, the issue at trial was whether the defendant doctors failed to diagnose and prevent the decedent's impending heart attack. The plaintiff, in her case-in-chief, called an expert who testified that the decedent's medical records showed clear signs of a prior heart attack, clear warning signs of an impending heart attack, and that on October 31, 1988, the decedent had described angina, a symptom of heart disease, to Dr. Zia, one of the defendants. It was the plaintiff's expert's opinion that based upon the information Dr. Zia recorded in his office notes, Dr. Zia should have recognized the decedent's complaints as symptomatic of heart disease and responded accordingly.

Dr. Zia testified about the October 31, 1988, exam in the defendants' case-in-chief. According to Dr. Zia, the decedent had not described angina but, rather, had described musculoskeletal pain. Consequently, Dr. Zia did not believe the decedent was suffering from heart disease.

The supreme court found that the plaintiff's expert's testimony and the introduction of Dr. Zia's office notes opened the door to Dr. Zia's testimony under subsection 8-201(a) of the Act. The court found the plaintiff's expert, by putting his "gloss" on the notes, insinuated that the decedent visited Dr.

Zia specifically for a heart-related problem. Hoem, 159 Ill. 2d at 201. The court explained:

"In this case, allowing the representative of the deceased to introduce her version of why [the decedent] went to Dr. Zia, without giving an equal opportunity to Dr. Zia, would not advance the policy behind the Act. Under these circumstances, we find it fundamentally unfair to deny Dr. Zia an opportunity to explain his view of what happened. Left unchallenged, [the plaintiff's expert's] comments would have remained with the jury as the only testimony regarding the conversation between Dr. Zia and [the decedent]." Hoem, 159 Ill. 2d at 202.

In this case, we similarly find that the plaintiff, by presenting expert testimony establishing that Drs. Barron and Hassaballa violated the standard of care by failing to recognize Hudgins's symptoms to be indicative of a subdural bleed, opened the door to Dr. Barron's testimony that he did not find the symptoms, including the headaches, to be suspect.

The plaintiff would have us find that Dr. Barron's testimony about prior headaches referenced conversations that occurred well

before Hudgins's July 1999 admissions.  However, we draw no such conclusion.  Rather, we find the prior conversation to be those that were documented in the medical records admitted at trial and to which the plaintiff opened the door, namely, the complaints Hudgins made while at Rush in July 1999.  The plaintiff's experts, including Drs. Heller and Markand, interpreted those records as indicating Hudgins was experiencing new symptoms, including headaches and nosebleeds, that Dr. Barron should have recognized as possibly indicating a subdural bleed.  Once the door was opened to these conversations, Dr. Barron was entitled to explain his view--that he did not consider these symptoms to be new because Hudgins had had them before.

The fifth instance happened while Dr. Barron, still testifying for the defense, was being cross-examined by the plaintiff's attorney.  Counsel asked Dr. Barron about the medications Hudgins was taking and whether she reported a headache to him on July 21, 1999.

"Q.  Did you know or not know, Doctor, whether she had headache, nausea, and vomiting on the morning of the 21st?

A.  I was aware from the previous notes that she had epigastric pain.  This is commonly seen in patients with heart failure,

29

nausea, vomiting.  The headache was of no

consequence.  I assessed it as of no

consequence and viewed this patient's

previous history, her medications, that it

did not strike me as important.

        Q.  It wasn't important?

        A.  It was her [sic] ordinary [Mrs.]

Hudgins."

We do not find this testimony to be referencing any prior conversations or events.  Moreover, as the plaintiff failed to make any objection to the testimony, she has waived her contention that it violated the Act for purposes of appeal.  See In re Estate of Netherton, 62 Ill. App. 3d 55, 59, 378 N.E.2d 800 (1978); see also Malanowski v. Jabamoni, 332 Ill. App. 3d 8, 11, 772 N.E.2d 967 (2002).

We consequently find no error in the circuit court's application of the Dead-Man's Act in this case.

                II.  Cross-examination of Dr. Greenlee

The plaintiff next contends the trial court committed reversible error when it ruled the defendants' cross-examination of Dr. Greenlee was within the scope of direct examination.

Dr. Greenlee is the neuroradiologist who interpreted the July 29, 1999, MRI of Hudgins's brain at Rush.  He indicated his

30

findings in a report also dated July 29, 1999. That report states, "[c]orrelative examination is a noncontrast CT scan of the brain from [Westlake] Hospital dated July 28, 1999." Written in the "impression" section of the report is "subdural hematoma in the late subacute stage which is seen along the right frontal, right parietal and right occipital lobes."

Prior to trial, the plaintiff disclosed Dr. Greenlee as an independent expert witness pursuant to Supreme Court Rule 213(f) (210 Ill. 2d R. 213(f)). The plaintiff's Rule 213(f) disclosure states, "Dr. Greenlee is expected to testify consistent with his MRI Report dated July 29, 1999."

On September 13, 2004, Dr. Greenlee gave a videotaped deposition. At the time the deposition was taken, Dr. Greenlee no longer worked at Rush. As far as can be determined from the record, when Dr. Greenlee gave his deposition, he was presented with films of Hudgins's July 28, 1999, CT scan taken at Westlake, and of the July 29 MRI scan taken at Rush, and the report he created interpreting the July 29 MRI. On direct examination by the plaintiff's attorney, Dr. Greenlee stated his July 29 report determined Hudgins's subdural hematoma was in the late subacute stage, meaning the bleeding began several days to several weeks prior to the scan. Dr. Greenlee was not able to approximate the date on which the bleeding began with more accuracy, explaining,

31

"[A]ccurately dating subdural hematomas on MR[I] is difficult because there's quite a bit of variability in the appearance of subdural hematomas in the subacute stage." Dr. Greenlee also explained MRI reports describe a hematoma in "the most advanced stage of breakdown." Thus, Hudgins's subdural hematoma was classified as being in the late subacute stage "even though there [were] still blood products which would be from the early subacute stage." Dr. Greenlee also testified if he wanted to more specifically age a subdural hematoma showing characteristics of the early and the late subacute stages, he would refer to the patient's clinical history or "compare [the MRI scan] to the CT scan."

Dr. Greenlee testified he used a CT scan of Hudgins's brain taken at Westlake on July 28, 1999, as a comparison in order to determine whether the subdural hematoma had changed; for instance, whether "there was increasing mass effect or new bleeding." Dr. Greenlee also explained comparing CT scans and MRI scans was somewhat like comparing apples and oranges because "[d]ifferent scans show different things to advantage." Dr. Greenlee testified "within the ability to compare CT and MR[I]" there had been "no significant change in the size of the subdural hematoma or the degree of mass effect" between July 28 and July 29. Dr. Greenlee, however, did not testify on direct examination

that he attempted to date the subdural hematoma by interpreting the CT scan.

When cross-examined by defense counsel, Dr. Greenlee was asked whether MRI or CT technology was preferred in dating hematomas. Dr. Greenlee responded that there was no preference, but that each technology showed different things. In looking at Hudgins's CT scan, Dr. Greenlee testified the hematoma was "probably less than one to two weeks old." By comparing the CT scan with the MRI, Dr. Greenlee's opinion, based upon a reasonable degree of medical certainty, was the hematoma was in the "several days to a week period."

Prior to the presentation of Dr. Greenlee's deposition at trial, the plaintiff's attorney argued defense counsel's cross-examination went beyond the scope of direct examination and focused on Dr. Greenlee's interpretation of the Westlake CT scan rather than the Rush MRI. The plaintiff also asserted Dr. Greenlee essentially testified as an undisclosed expert witness on behalf of the defendants. The trial court overruled the plaintiff's objection. The plaintiff contends on appeal the trial court's ruling was in error.

As a general rule, cross-examination is limited to the scope of direct examination. Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 105, 658 N.E.2d 450 (1995). "However,

33

circumstances resting within the witness' knowledge may be developed on cross-examination that explain, qualify, discredit, or destroy the witness' direct testimony, even though that material may not have been raised on direct examination." Leonardi, 168 Ill. 2d at 105-06. The scope of cross-examination does not refer to the actual material discussed during direct examination, but rather to the subject matter of the direct examination. Neal v. Nimmagadda, 279 Ill. App. 3d 834, 840, 665 N.E.2d 424 (1996). The scope of cross-examination lies within the sound discretion of the trial court and will not be disturbed on review absent an abuse of that discretion. Leondardi, 168 Ill. 2d at 102.

In this case, the subject matter of Dr. Greenlee's direct testimony was the age of Hudgins's subdural bleed. Asking Dr. Greenlee to date the age of the bleed based on the July 28 CT scan, which had been used as a comparison when the July 29 MRI was dated, was not beyond the scope of this subject matter, especially where it served to explain the testimony Dr. Greenlee gave during direct examination. This court cannot say the circuit court abused its discretion.

### III. Jury Instructions

A. Instruction based on IPI Civil (2005) No. 30.23

The plaintiff tendered an instruction based on Illinois

34

Pattern Jury Instructions, Civil, No. 30.23 (2005) (hereinafter IPI Civil (2005) No. 30.23), titled "Injury from Subsequent Treatment." The trial court refused to give the instruction because there was no evidence of subsequent medical negligence or of subsequent treatment causing or aggravating an injury.

The plaintiff's tendered instruction states, "If defendants negligently cause a condition of the plaintiff, then the defendants are liable not only for the plaintiff's damages resulting from that condition, but are also liable for the plaintiff's damages sustained by the plaintiff arising from the efforts of health care providers to treat the condition caused by the defendant." The jury's verdict was that the defendants were not negligent. The plaintiff maintains that omitting the instruction was still error even in the face of the jury's verdict for the defendants. The plaintiff contends this is so because the tendered instruction is not strictly a damages instruction and the failure to give the tendered instruction may have led to a verdict in favor of the defendants because "the jury could be confused as to the applicable law."

The Comments to IPI Civil (2005) No. 30.23 support the plaintiff's position that the instruction may have an impact on a jury beyond damages because "[a] jury might perceive the subsequent provider as the wrongdoer and 'acquit[] the defendant

on that basis.' " IPI Civil (2005) No. 30.23, Comments, at 141,
quoting Kolakowski v. Voris, 94 Ill. App. 3d 404, 413, 418 N.E.2d
1003 (1981). The operative notion behind the instruction,
however, is the existence of a "subsequent provider as the
wrongdoer."

On the record before us, as the trial court found, there was
no subsequent wrongdoer; nor has the plaintiff identified any
subsequent wrongdoer. The plaintiff maintains that the
instruction may be given when "there is evidence that a
subsequent health care provider caused or aggravated the injury"
without any showing that such a subsequent provider was
negligent. IPI Civil (2005) No. 30.23, Notes on Use, at 141.
Before this instruction should be given, however, it is necessary
that "the issue of the subsequent medical provider having caused
or aggravated an injury [be] injected into the case." IPI Civil
(2005) No. 30.23, Comments, at 141. The circuit court found no
such issue present in this case.

While the plaintiff focuses on Dilantin being prescribed,
which likely led to the development of the Stevens-Johnson
syndrome which in turn led to renal failure and the death of
Hudgins, there was no evidence that the medical care providers at
Westlake had any choice but to administer Dilantin when Hudgins
was admitted in status epilepticus. In other words, there was no

reasonable basis to contend that the jury might perceive the health care providers at Westlake to be wrongdoers in prescribing Dilantin and "acquit the defendants on that basis." The plaintiff's theory was that the defendants were negligent in not discovering the subdural hematoma earlier, and had they done so, the need to prescribe Dilantin might have been avoided. The administration of Dilantin at Westlake was of no consequence under the plaintiff's theory.

We find no error on the part of the circuit court in rejecting this instruction.

B. Instruction based on IPI Civil (2005) No. 30.21

A similar situation exists regarding the trial court's refusal to give the plaintiff's instruction based on Illinois Pattern Jury Instructions, Civil, No. 30.21 (2005) (hereinafter IPI Civil (2005) No. 30.21), titled "Measure of Damages--Personal Injury--Aggravation of Pre-Existing Condition--No Limitations." According to the plaintiff, the tendered instruction concerned "a pre-existing condition which rendered [Hudgins] more susceptible to injury." The instruction states, "If you decide for the plaintiff on the question of liability, you may not deny or limit the plaintiff's right to damages from this occurrence because any injury to Vernestine Hudgins resulted from a pre-existing

condition which rendered her more susceptible to injury."[3] Again, the jury's verdict was that the defendants were not negligent. Again, the plaintiff maintains that IPI Civil (2005) No. 30.21 "is not strictly a damages instruction," citing as her principal authorities <u>Dabros v. Wang</u>, 243 Ill. App. 3d 259, 611 N.E.2d 1113 (1993), and <u>Shvartsman v. Septran, Inc.</u>, 304 Ill. App. 3d 900, 711 N.E.2d 402 (1999).

The plaintiff contends the trial court refused the instruction because "such an instruction did not belong in a

---

[3] A tension between the rejected instructions likely would have arisen had both IPI Civil (2005) No. 30.21 and IPI Civil (2005) No. 30.23 been given in this case. Under IPI Civil (2005) No. 30.23, the plaintiff's contention appears to be that the failure of the defendants to timely detect the brain bleed on or about July 17, 1999, led to the required medical treatment of administering Dilantin at Westlake, which gave rise to the damages suffered by the plaintiff. However, under IPI Civil (2005) No. 30.21, the plaintiff's contention appears to be that the brain bleed was a preexisting condition, apparently placing no responsibility on the defendants for the existence of the condition. We agree with the defendants that the giving of both instructions would have confused the jury.

medical malpractice/loss of change action." We do not share the plaintiff's understanding of the circuit court's ruling. Rather, the trial court ruled that the instruction did not apply "in this medical malpractice/loss of chance case." The circuit court's ruling turned not on the application of the doctrine of loss of chance but on the nature of the claimed "preexisting condition" present in this case. The facts of this case do not support the plaintiff's claim of error based on the authorities cited by the plaintiff.

In Dabros, a mother took her months-old child to her pediatrician because of her concern over what she characterized as a "bruise" on the side of the infant's left leg near the knee. Over the next few months, the mark on the infant's leg started to rise, became discolored and continued to grow. Eventually, the mother was referred to the defendant doctor, who recommended immediate surgery to remove the growth from the plaintiff's leg. The plaintiff's theory of the case was that by excising the mark (hemangioma) when he should not have, the defendant aggravated her already present injury, not that he caused in any way the hemangioma itself. The existence of the condition of the hemangioma was uncontested and served as the basis for the medical treatment the plaintiff received and complained of. We found error in not giving IPI Civil 3d No. 30.21, but found the

39

error harmless because "it was not possible for the jury to have been confused as to what type of injury it was required to find in order to hold defendant liable for negligently treating plaintiff." Dabros, 243 Ill. App. 3d at 270.

Shvartsman addresses the situation where the plaintiff had a preexisting condition that made her more susceptible to injury. In Shvartsman, the plaintiff suffered an injury to her right knee, resulting in a displacement of her kneecap, the claimed injury in the lawsuit. The plaintiff had a preexisting condition in both knees that made her more susceptible to displace her kneecap. As one of two grounds for reversing the verdict for the defendant, we found the circuit court erred in refusing to instruct the jury with IPI Civil 3d No. 30.21 "because the jury was not properly informed of the legal effect of a preexisting injury." Shvartsman, 304 Ill. App. 3d at 905.

Both Dabros and Shvartsman stand for the proposition that where there is evidence of a preexisting condition that is aggravated by the claimed negligence or that makes the plaintiff more susceptible to the type of injury complained of, IPI Civil No. 30.21 should be given. That proposition has no application here.

In her main brief, the plaintiff contends that "[i]t was [her] theory, as articulated to the court, that the pre-existing

40

condition, the brain bleed, without treatment, developed into a subdural hematoma that caused seizures." The defendants challenge this assertion: "[I]t was never quite clear in the trial court exactly what plaintiff considered the 'pre-existing condition rendering her more susceptible to injury' to be. Sometimes she argued that it was 'the need for anticoagulation' *** other times that it was the subdural hematoma."

Regardless, what is clear is that the "brain bleed" was not a preexisting condition in the manner of the preexisting conditions in Dabros and Shvartsman. Contrary to the plaintiff's claim, the brain bleed was not a preexisting condition but a condition that may have arisen sometime after she was first admitted to Rush in July 1999 (there was conflicting expert testimony as to when the brain bleed may have begun). This condition in turn triggered medical treatment that led to the development of Stevens-Johnson syndrome, which in turn led to renal failure. As made clear by the instructions, the jury was charged with determining whether the brain bleed developed during Hudgins's stay at Rush. If the brain bleed arose after Hudgins left the care of the defendants, then no liability could attach to the defendants for their failure to detect a condition that did not exist when she left the defendants' care. Thus, the brain bleed was not a preexisting condition as that term is used

in either Dabros or Shvartsman to warrant the giving of IPI Civil (2005) No. 30.21.  The circuit court did not err in rejecting the plaintiff's proposed instruction.[4]

CONCLUSION

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

--------

[4] We also question the role IPI Civil (2005) No. 30.21 would have played in the jury's deliberation in light of the following non-IPI "loss of chance" instruction given over the defendants' objection.  "If you decide or if you find that the plaintiff has proven that a delay in diagnosis and treatment of Vernestine Hudgins' brain bleed lessened the effectiveness of the medical services which she received, you may consider such delay as one of the proximate causes of her claimed injuries and death."  The jury's verdict for the defendants logically requires the conclusion that the delay in diagnosis and treatment of the brain bleed was not a proximate cause of the claimed injuries.  Because there was no negligent delay, it necessarily follows that the circuit court's rejection of the instruction along the lines of IPI Civil (2005) No. 30.21 was at most harmless error.  See Dabros, 243 Ill. App. 3d at 270.

42

1-05-1006

CAHILL, P.J., and R. GORDON, J., concur.