2021 IL App (2d) 200462-U
No. 2-20-0462
Order filed September 22, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PHILIP ROBINSON and BEVERLY ROBINSON, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 14-L-232 |
| | ) | |
| TODD D. ALEXANDER, M.D., | ) ) | Honorable Donna R. Honzel, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Bridges and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in (1) barring a controlled expert witness from testifying regarding defendant's alleged deviation from the standard of care, (2) barring a controlled expert witness from testifying regarding an undisclosed opinion on causation and injuries, and (3) refusing to instruct the jury in accordance with Illinois Pattern Jury Instruction, Civil, No. 30.23. Affirmed.

¶ 2    Plaintiffs, Philip Robinson and Beverly Robinson, sued defendant, Todd D. Alexander, M.D., for medical negligence and loss of consortium, respectively. Following trial, the jury returned a verdict in favor of defendant and against plaintiffs. Plaintiffs appeal the judgment on

the jury's verdict and the trial court's denial of their posttrial motion. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The lawsuit arose out of a March 13, 2013, multilevel cervical spine surgery that defendant, a neurosurgeon, performed on Philip. We recount Philip's medical history as derived from the trial testimony and exhibits. At the time of the surgery, Philip was 69 years old. There was no dispute that Philip had an approximately 20-year history of neck pain. Over the years, Philip was treated with physical therapy, chiropractic adjustments, and steroid injections. A 2010 magnetic resonance imaging (MRI) of Philip's spine showed a bony overgrowth pinching the nerves in the spinal canal. Philip's medical history also included a 2006 back surgery, performed by defendant, and a 2008 left rotator cuff surgery.

¶ 5     In early 2013, Philip reported neck pain radiating down his right arm, elbow pain, and numbness and tingling in his right hand. His primary care physician ordered an MRI of Philip's spine and an electromyogram (EMG) to test Philip's hand and arm muscles for signs of nerve injury. A January 28, 2013, MRI revealed cervical spondylosis (neck arthritis). The neurologist who conducted a February 5, 2013, EMG, Younghua Zhang, M.D., found "electrophysiologic evidence of a right ulnar nerve entrapment neuropathy at elbow with no evidence of axonal loss" and "no electrophysiologic evidence of right C5-T1 radiculopathy." Philip's primary care physician referred Philip to defendant.

¶ 6     Following a February 21, 2013, examination, defendant reported that Philip "has a right C8 radiculopathy secondary to C7-T1 foraminal stenosis. This is not an ulnar nerve neuropathy and the EMG result is spurious." Defendant explained his diagnosis of a radiculopathy (a neck problem) as opposed to ulnar nerve neuropathy (an elbow problem). First, Philip's complaint of

pain in the neck that radiated down his arm was not characteristic of an ulnar nerve problem. Rather, he testified, an ulnar nerve problem "would usually have the pain centered at the elbow and then go from there down the arm." Second, Philip reported that slouching forward relieved the symptoms and standing tall worsened the symptoms. This report was suggestive of "the problem being in his neck" and "would not be consistent with something in the elbow."

¶ 7     Moreover, defendant testified that, upon examination, Philip did not show signs of ulnar nerve entrapment. The "Tinel" test (tapping on his elbow) did not cause Philip to feel a "zinger" down his arm—a typical sign of a pinched nerve in the elbow. Nor did Philip exhibit a loss of sensation on the side of his ring finger, or "splitting of the sensation in the fingers." Defendant examined Philip's hand and found atrophy (wasting away) of the first dorsal interossei muscle— consistent with nerve root compression in Philip's neck. Philip also had weakness in his ability to spread the fingers of his right hand.

¶ 8     Regarding his review of Philip's January 28, 2013, MRI, defendant testified that Philip had profound compression at the C7-T1 vertebral level encompassing the C8 nerve root. Defendant concluded that this condition fit with Philip's clinical presentation of cervical radiculopathy, and not with ulnar nerve neuropathy. The MRI images also showed bone spurs at levels C5-6 and C6-7 sticking out in front, narrow and collapsed disks, and bone spurs projecting toward the spinal cord. In addition, the MRI showed significant pinching of nerves on the right side—indicative of a neck problem. Defendant acknowledged that he did not compare the January 28, 2013, MRI with the 2010 MRI of Philip's spine.

¶ 9     Defendant diagnosed C8 radiculopathy and degenerative spondylosis at levels C5-6 through C6-7. Defendant recommended multilevel cervical spine surgery. Defendant testified that

he explained to Philip the general risks of surgery as well as the specific risks of the operation, including nerve injury and construct or fusion failure. Philip signed a general consent form.

¶ 10      The subsequent March 13, 2013, surgery included "significant" bone removal to free the nerve root and placement of a plate and bone graft to stabilize the spine. Defendant placed screws into Philip's C7 and T1 vertebrae from the back and connected them with a rod. This placement is referred to as the construct. Defendant also removed disc material and a bone spur from the front of Philip's spine and used screws and a plate to stabilize the area. Philip was prescribed pain medication and physical therapy and given a cervical collar to wear around his neck following the surgery.

¶ 11      Philip suffered post-surgical complications. His neck and arm pain remained. His right arm was worse immediately after the surgery, still tingled, and was painful and weak. His left arm eventually grew weak, and Philip reported problems with his hands. After an April 11, 2013, follow-up examination, defendant ordered x-rays and ultimately a computerized tomography (CT) scan to explore the status of the surgical fusion. In reviewing the April 15, 2013, CT scan, defendant testified that he detected "significant problems in relation to the subsidence and kyphotic angulation that was occurring and that screw at C7 pulling out"—all of which were signs that the construct was failing. On April 22, 2013, defendant advised Philip that surgical intervention was necessary. In response to Philip's inquiry about an alternative to surgery, defendant advised of the possibility that the condition could resolve on its own if Philip remained in the cervical collar.

¶ 12      Philip sought a second opinion the next day, on April 23, 2013, with Marc Soriano, M.D., a neurosurgeon. Dr. Soriano testified that he examined Philip, took a history, and reviewed the CT scan. Dr. Soriano noted that Philip had complete atrophy of his intrinsic hand muscles, could not grasp with his right hand or split his fingers, and had no finger or wrist extension on the right.

Philip's hands were nonfunctional. Dr. Soriano further noted numbness of Philip's left thumb and increasing severe neck pain. Given the symptoms on both the right and left hands, Dr. Soriano was concerned that Philip had a progressive situation with something pushing on Philip's nerve roots or spinal cord. From his review of the CT scan, Dr. Soriano saw that Philip had a significant fracture and "slip-off" of C7 and was concerned that the screw could move further and damage the nerve roots or spinal cord. Dr. Soriano referred Philip to Russ Nockels, M.D., a neurosurgeon specializing in complex spinal disorders.

¶ 13    That same day, on April 23, 2013, Dr. Nockels examined Philip and ordered imaging studies. Dr. Nockels identified vertebral fractures, concluded that the posterior hardware had failed, and that kyphosis (a forward bending) had developed. Dr. Nockels advised that a second surgery was necessary.

¶ 14    Dr. Nockels performed the second surgery on May 3, 2013. The surgical plan was to stabilize the spine and address ongoing compression of the nerves. His goal was to reduce the kyphosis and place new hardware to prevent recurrence. Dr. Nockels testified that he reopened the previous incision and removed the screws and rods in the back that were completely disengaged. He removed additional bone to view the nerves and confirm no compression as he straightened Philip's spine. Dr. Nockels placed implants on both sides of Philip's spine to prevent development of spinal deformity and placed bone grafts in the front of both sides of Philip's spine. For additional protection, Dr. Nockels placed Philip in a halo device—a metal ring attached to the skull that rested on a vest. Philip gained some strength after the surgery and retained the realignment of his spine.

¶ 15    Philip's right hand remained dysfunctional; Philip was unable to open the hand at this point. Dr. Nockels referred Philip to Michael Bednar, M.D., a hand surgeon, for a tendon transfer.

Following the January 2014, tendon transfer surgery and physical therapy, the functionality in Philip's right hand improved somewhat.

¶ 16     In subsequent years, follow-up examinations reflected that Philip continued to experience pain in the back of his neck, "residual numbness in the right greater than his left arm and into the thumb," bilateral upper extremity weakness, fine motor dysfunction, and the likelihood of permanent neurologic dysfunction in his right hand. Philip testified that he can no longer perform basic activities, such as buttoning his shirt, zipping his pants, or putting on socks.

¶ 17     Plaintiffs filed this lawsuit on July 28, 2014. Dr. Alexander was the sole defendant in the operative complaint (the first amended complaint). Plaintiffs alleged that defendant was negligent in not consulting regarding the February 5, 2013, EMG and/or order follow-up testing, not informing or offering Philip treatment options for ulnar nerve entrapment, not informing Philip of the risks of multilevel cervical spine surgery, negligently performing the surgery, and not timely diagnosing and recommending appropriate treatment for the postoperative failure of the construct.

¶ 18                              A. Pretrial

¶ 19     The parties engaged in extensive discovery and pretrial motion practice, as discussed in relevant part below.

¶ 20                    1. Rule 213(f)(3) Controlled Expert Witnesses

¶ 21     Plaintiffs disclosed the following physicians as controlled expert witnesses pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007): (1) Marc A. Levin, M.D., a neurosurgeon; (2) Neil Allen, M.D, a neurologist; and (3) Mary Elizabeth Jensen, M.D., a diagnostic and interventional neuroradiologist. Defendant disclosed the following physicians as controlled expert witnesses (in addition to defendant) pursuant to Rule 213(f)(3): (1) Andrew G.

Chenelle, M.D., a neurosurgeon; (2) Dane M. Chetkovich, M.D., a neurologist; and (3) Joel R. Meyer, M.D., a neuroradiologist.

¶ 22     Pertinent to our analysis are the pretrial disclosures and depositions of two of plaintiffs' controlled expert witnesses—Dr. Levin and Dr. Allen.

¶ 23                                     a. Dr. Levin

¶ 24     Plaintiffs' Rule 213(f)(3) disclosure of Dr. Levin provided in relevant part:

> "Dr. Levin is expected to testify that nothing in the EMG results appears to be 'spurious' or inaccurate. The results of the EMG appear to accurately reflect an entrapped ulnar nerve at the elbow which is consistent with Mr. Robinson's clinical complaints of right arm pain, numbness and weakness. If Dr. Alexander believed the results of the EMG were 'spurious,' the standard of care required him to contact and consult with the physician who performed the EMG to discuss his concerns. If consultation did not resolve Dr. Alexander's concerns, the standard of care required ordering additional testing before dismissing the clinical exam consistent with the results of the EMG in favor of multi-level spine surgery. More likely than not, had the results of the EMG been acted upon or more thoroughly investigated, any concern, legitimate or not, regarding the EMG results would have been resolved, and a reasonably careful neurosurgeon would have pursued treatment of the ulnar nerve instead of multi-level spine surgery.
>
> * * *
>
> Dr. Levin will opine that the aforesaid negligent acts or omissions were a proximate cause of permanent injuries to Philip Robinson, including pain and suffering, disability and disfigurement."

¶ 25    Dr. Levin testified at his discovery deposition that defendant deviated from the standard of care by failing to consult with Dr. Zhang regarding the EMG, disregarding the EMG results, and proceeding to surgery. However, Dr. Levin acknowledged that he did not know what would have been said in the consultation. Specifically:

"Q: I take it you don't know because you haven't spoken to the electrophysiologist and his deposition hasn't been taken, but you don't know what the electrophysiologist may have said had he been contacted by Dr. Alexander; is that fair?

A. How could I know that?

Q: You can't right?

A. Correct.

Q. It would be speculative for you to say what the electrophysiologist would have said, true?

A. Absolutely."

¶ 26    Dr. Levin added that, if the consultation did not resolve defendant's concerns, the standard of care required him to order additional tests, including, at a minimum, a second EMG, before disregarding the EMG in favor of multilevel spinal surgery. However, he did not have an opinion as to what a repeat EMG would have shown. Dr. Levin further testified that the ulnar nerve entrapment alone, or the ulnar nerve entrapment in conjunction with a C8 nerve root problem, could have been the explanation for Philip's right arm problems. To make this determination, according to Dr. Levin, defendant should have performed surgery on the ulnar nerve before proceeding to multilevel spine surgery.

¶ 27                                b. Dr. Allen

¶ 28    Plaintiffs' Rule 213(f)(3) disclosure of Dr. Allen provided in relevant part that he was expected to testify on issues of causation and injuries and the matters set forth in his attached March 9, 2017, report. The report recounted Philip's medical history based upon Dr. Allen's review of records. He noted that Philip "subscribed to dizziness, hearing loss, heartburn, joint, back and neck pain, numbness, depression, sleep disturbance, headaches, anxiety and weakness" and "said he has problems with his gait stability." Dr. Allen also referred to a formal history and noted Philip's description of neck pain and upper extremity issues and the surgeries that had been performed. The report further detailed Dr. Allen's February 27, 2017, examination of Philip and noted that "[a]t the time of this examination, there is evidence of nerve damage on the right predominantly at C7-T1, particularly on the C7 and C8 nerve roots," that "[t]he type of changes seen would not be seen unless there had been significant evidence of atrophy prior to the time of this first surgical procedure that was conducted in March 2013," and that Philip "denies before the March 2013 surgery having atrophy of the hands or being unable to use his right hand ***." Dr. Allen concluded in his report that Philip "is suffering severe disability because of difficulty with the use of both his right and left upper extremities, despite the tendon transfer which was necessitated as a result of the injuries that were done to his distal right upper extremity."

¶ 29    At his discovery deposition, Dr. Allen was questioned regarding his review of Philip's medical records and his February 27, 2017, neurological examination of Philip. Dr. Allen testified that Philip subscribed to dizziness and other conditions. He was asked, "Fair to say that dizziness would not be attributable to any alleged nerve root injury?" Dr. Allen responded: "It wouldn't be attributable to a nerve root injury. It would be attributed to any type of a cervical derangement because that's called cervicogenic vertigo and it's seen in people who have feelings and perceptions of loss of balance or instability who have neck problems because of what's known as

the tectospinal pathway *** which goes from the brainstem down to the cervical spine and gives the sense of position in space." Dr. Allen acknowledged that there are other causes of dizziness. Dr. Allen further testified that Philip reported problems with his gait stability but that there was no report of falling down at any time in the months prior to the examination.

¶ 30    Dr. Allen also testified at his discovery deposition that he frequently interprets EMGs and that the February 5, 2013, EMG showed electrophysiological evidence of a right ulnar nerve entrapment neuropathy at the elbow with no evidence of axonal loss. He explained that the absence of evidence of axonal loss means that the neuropathy could reverse on its own. When questioned as to whether EMGs are reliable in detecting electrophysiological evidence of a right C5-T1 radiculopathy, Dr. Allen responded, "If they're motor. If they're sensory, they're not as reliable, and they're not reliable in the first 14 days—10 to 14 days after injury is the other thing that you have to know."

¶ 31    Subsequently, at his evidence deposition (which proceeded six days before trial), Dr. Allen testified regarding Philip's report of dizziness. He explained that dizziness in this context was not related to any cervical root injury. Rather, "[i]t's due to damage to the supporting structures, which cause changes within the structure of the spinal cord itself and the messages being relayed between the position of the legs in space and the message that's being sent to the brain through a pathway, a fancy pathway called the tectospinal pathway." Over defendant's Rule 213 objection, Dr. Allen identified the condition as cervicogenic vertigo and stated that "it could be accounted for by the spine surgery and by the loss of blood supply to the spinal cord." In this regard, Dr. Allen concluded: "It is my opinion with a reasonable degree of medical and surgical certainty that the patient might or could have cervicogenic vertigo as a result of the cervical procedure that disrupted

the stability of the cervical spine during the procedure of March and the subsequent procedure by Dr. Nockels in 2013."

¶ 32    However, Dr. Allen acknowledged that he tested Philip's gait and station (ability to stand up stably) during the neurological examination and that they were normal. Moreover, the following testimony was elicited:

"Q. And you would agree that you did not diagnose Mr. Robinson with cervical vertigo, true?

A. Cervicogenic vertigo?

Q. Yeah, cervicogenic vertigo.

A. I didn't diagnose him at the time I saw him because he wasn't complaining of it then.

A. And you never diagnosed him. You didn't diagnose him at the first time or the second time that you saw him. You did not make that diagnosis of this patient, true?

A. True.

Q. And when you first saw him, he did make a complaint to you of some dizziness, true?

A. Yes.

Q. And we already talked about the examination of his gait and station were normal when you saw him, correct?

A. Yes, we talked about it."

¶ 33    Dr. Allen also testified at his evidence deposition about the EMG findings and the absence of electrophysiologic evidence of a right C5-T1 radiculopathy. Plaintiffs' counsel questioned Dr. Allen at the evidence deposition as follows: "[A]s a neurologist who has been involved with EMGs

over the years in your career, do you occasionally get requested by the ordering physician or some subsequent physician taking care of the patient to answer questions about an EMG interpretation that you've given?" Over defendant's Rule 213 objection, Dr. Allen responded affirmatively and subsequently explained:

> "If I were performing the test and I was asked for my interpretation, I would just simply tell them what I said in the report. If they asked me what it meant, I would provide an interpretation of what it meant, I would provide an interpretation of what it means. If I examined the patient and I read the report, I would give them my interpretation of both my examination as well as my report, my review of the report."

¶ 34                                    2. Motions *in Limine*

¶ 35     The parties filed numerous motions *in limine*. Relevant to this appeal are defendant's motion *in limine* Nos. 10 and 14.

¶ 36                                 a. Motion *in Limine* No. 10

¶ 37     Defendant filed a "Motion *In Limine* To Bar Criticisms Related To Any Alleged Failure To Consult An Electrophysiologist Or Physician Regarding The EMG Completed Prior To Surgery" (motion *in limine* No. 10). The motion sought to preclude Dr. Levin from testifying as to his opinion that defendant was negligent in failing to consult another physician regarding the EMG results and/or order follow-up testing. Defendant argued that the opinion was based upon unsubstantiated speculation. Indeed, Dr. Levin testified that he did not know what the physician would have said in the consultation and acknowledged that it would be speculative to assert what would have been said. Accordingly, defendant argued that plaintiffs could not establish that the alleged deviation from the standard of care was causally related to Philip's injuries.

¶ 38    Plaintiffs responded that Dr. Allen's testimony at his discovery deposition established the causal link, *i.e.*, "the evidence of what a reasonably careful neurologist who interprets EMGs would have concluded—that this was a true ulnar nerve neuropathy that was reversible and would have informed Defendant Alexander accordingly." They cited Dr. Allen's testimony regarding his interpretation of EMGs in his practice and his discussion of Dr. Zhang's EMG findings. Thus, according to plaintiffs, consistent with Dr. Levin's Rule 213(f)(3) disclosure, a reasonably careful neurosurgeon would have performed ulnar nerve surgery before contemplating spine surgery, and, as Dr. Levin testified, the ulnar nerve surgery more likely than not would have resolved most, if not all, of Philip's right arm problems.

¶ 39    During argument on the motion *in limine*, the trial court stated that there was no disclosed opinion linking the alleged failure to consult and Philip's injuries. Specifically, the trial court stated, Dr. Allen "doesn't tie up that, had an electrophysiologist been consulted, that he would have said anything other than a whole lot of things including that it's an ulnar neuropathy that could reverse itself because it showed no axonal loss ***." Indeed, Dr. Allen "never definitively said if there would have been anything different from the consult." The trial court, however, reserved ruling pending review of Dr. Allen's evidence deposition testimony. The trial court subsequently entered an order granting defendant's motion *in limine* number 10 "unless plaintiffs can direct the Court to a disclosed expert opinion linking up the criticism with expert testimony."

¶ 40                              b. Motion *in Limine* No. 14

¶ 41    Defendant filed a "Motion *In Limine* To Bar Any Testimony Or Argument That Dr. Alexander Caused: (1) Any Injury To Philip Robinson's Lower Extremities, (2) A Propensity To Fall, Or (3) Dizziness." Defendant argued that plaintiffs did not disclose any expert witness to

opine that Philip had any such injury or condition as a result of the surgery. Thus, defendant sought to bar the testimony at trial.

¶ 42    Plaintiffs responded that there was ample evidence for a jury to conclude that the March 13, 2013, surgery was a cause of Philip's "interrelated problems with dizziness, propensity to fall and lower extremities issues." Namely, Dr. Allen noted Philip's history of dizziness and problems with gait stability in his report attached to the Rule 213(f)(3) disclosure of Dr. Allen. Also, plaintiffs and other lay witnesses testified in their depositions regarding Philip's dizziness and propensity to fall, and Philip testified that he did not have these problems before the March 13, 2013, surgery. Further, Philip was noted as being an "increased fall risk" on April 25, 2013, before his surgery with Dr. Nockels.

¶ 43    Following argument, the trial court granted defendant's motion *in limine* No. 14, "unless plaintiffs can direct the Court to a disclosed expert opinion linking up the criticism with expert testimony." The trial court reasoned that, in discovery, Dr. Allen merely identified the condition of cervicogenic vertigo and stated that it may accompany dizziness or loss of balance but did not relate the condition to the claims against defendant.

¶ 44                                    B. Trial

¶ 45    Both parties label this case "a battle of the experts." In addition to the testimony of the treating physicians as discussed above, the parties' controlled expert witnesses testified at trial. We recount their testimony.

¶ 46                    1. Plaintiffs' Controlled Expert Witnesses

¶ 47    Plaintiffs presented the testimony of Dr. Jensen, Dr. Levin, and Dr. Allen (by way of his videotaped evidence deposition).

¶ 48                            a. Dr. Jensen

¶ 49    Dr. Jensen testified regarding the results of Philip's 2010 and 2013 MRIs. She explained the images, compared the MRIs, and testified that there was no significant difference between them. The imaging displayed cervical spondylosis, compression into the spinal canal with bony overgrowth, multiple bone spurs, and bone-on-bone degenerative changes at C5-6, C6-7, and C6-7-T1. Dr. Jensen explained that the 2013 MRI did not reflect a significant change in Philip's condition—"there may have been a touch more compression at the C7-T1 posterior osteophyte." In addition, Dr. Jensen described the March 13, 2013, surgery as involving substantial removal of the vertebral body and other bone.

¶ 50                                    b. Dr. Levin

¶ 51    Dr. Levin opined that defendant deviated from the standard of care by (1) failing to inform Philip of treatment options for ulnar nerve entrapment instead of multilevel cervical spine surgery; (2) performing surgery that was not indicated; (3) not informing Philip of the risks of and alternatives to multilevel cervical spine surgery; (4) performing multilevel cervical spine surgery; and (5) not timely diagnosing and recommending appropriate treatment for postoperative failure of the construct. Dr. Levin further opined that defendant's professional negligence was a proximate cause of Philip's injuries.

¶ 52    Dr. Levin explained that some of the problems about which Philip complained could have been caused by ulnar nerve entrapment and that defendant's identification of the EMG results as "spurious" was not reasonably careful. He opined that nonsurgical or minor surgical treatment or some combination of these treatments of Philip's ulnar nerve entrapment likely would have resolved Philip's right arm issues. Dr. Levin further agreed with Dr. Jensen that there was no significant change between the 2010 and 2013 MRIs. During that time period, Philip was not having neck, arm, or spinal cord problems. Based upon these facts, Dr. Levin's impression was

that "a neurosurgeon would minimize treatment just to the area where the symptoms are"—here, "at the one level at C7-T1." Dr. Levin acknowledged that the symptoms Philip reported to defendant in March 2013 were consistent with cervical radiculopathy.

¶ 53                                    c. Dr. Allen

¶ 54    Dr. Allen opined that, based upon his training and experience, examination of Philip, and review of Philip's medical records, Philip "is suffering from severe disability due to the difficulty with the use of both his right and his left arms, upper extremities." He further opined that the cause of that disability "was direct nerve injuries on both the right and the left side either at or postsurgically [the March 13, 2013, surgery] due to collapse of the vertebra and damage to the nerve roots." Dr. Allen explained that the greatest damage was to the C8 nerve root—"the area in which the collapse occurred, and the hardware itself caused the direct compression and damage to the nerve roots." Dr. Allen opined that all of Philip's impairments occurred in connection with the injury to nerve roots as a result of the March 13, 2013, surgery, were a direct result of the surgery, and are all permanent. Dr. Allen explained that Philip suffered from disability due to difficulty in the use of his upper extremities resulting from "machinations" that occurred immediately or shortly after, but not during, the March 13, 2013, surgery.

¶ 55    In response to questioning as to whether an EMG is an objective test and reliable for diagnosing ulnar nerve neuropathy, Dr. Allen responded, "In the hands of the best examiner, it's the best test." Dr. Allen further testified that EMGs are reliable in detecting damage to the motor component of nerves. The treatment options for ulnar nerve entrapment include prescribing physical therapy, guarding the nerve by using an elbow guard or a hockey elbow protector, or performing a surgical procedure producing ulnar nerve decompression by moving the nerve. The

surgical option involves removing the bone on the side of the nerve, moving the nerve up to the front, and burying it between the muscle groups.

¶ 56    Dr. Allen acknowledged that longstanding chronic cervical pathology can cause muscle atrophy and that Philip's report of neck pain radiating down the arm is unlikely to be consistent with ulnar neuropathy. Dr. Allen also acknowledged that the negative Tinel test and the absence of the "classic" finding of split sensation in the ring finger pointed away from a diagnosis of ulnar neuropathy.

¶ 57                          2. Defendant's Controlled Expert Witnesses

¶ 58    Defendant presented the testimony of Dr. Meyer, Dr. Chenelle, and Dr. Chetkovich.

¶ 59                               a. Dr. Meyer

¶ 60    Dr. Meyer prepared a PowerPoint presentation of the relevant images of Philip's spine. Regarding the 2010 MRI, Dr. Meyer identified severely narrowed disc spaces at levels C2-5, including points where the bones touched, and described bony overgrowth in the front of C5-6 and severe bone-on-bone degenerative disease at C6-7. In addition, he identified significant disease at C7-T1, which he described as a "rock" sitting in the spinal canal, and bony overgrowth touching the spinal cord that could have been impacting the right C8 nerve root. Reviewing the 2013 presurgical MRI, Dr. Meyer observed that Philip's disease was "worse." Philip had significant cervical spondylosis, severe disc space narrowing, and bone-on-bone degenerative disease at C5-6, C6-7 and a component at C7-T1. This condition raised the concern of pressure on the nerve root and adjacent spinal cord.

¶ 61    In addition, Dr. Meyer reviewed an intraoperative x-ray taken during the March 13, 2013, surgery, Dr. Meyer explained that the radiograph showed that the screws were properly positioned and implanted with sufficient depth. Dr. Meyer further opined that an April 15, 2013, CT scan

showed failure of Philip's bones, not failure of the hardware. He explained that the hardware had moved down and back as a result of the failure and fracture of Philip's bones.

¶ 62                                      b. Dr. Chenelle

¶ 63    Dr. Chenelle testified that the March 13, 2013, surgery was within the standard of care. He opined that, based upon Philip's symptoms, the standard of care did not require defendant to offer or discuss treatment options for ulnar nerve entrapment. He cited defendant's report from the February 21, 2013, examination of Philip, which localized the chief complaint as a C8 right-sided radiculopathy, and noted Philip's complaint of pain radiating from the neck down to the arm and pain relief when slouching, the absence of split ring finger sensation, and the negative Tinel test. Dr. Chenelle further testified that the negative finding of cervical radiculopathy in the EMG report was not significant. In Dr. Chenelle's view, defendant appropriately considered the EMG findings when evaluating Philip and clinically correlated Philip's history, physical examination, and imaging studies to reach a reasonable diagnosis—nerve root C8 radiculopathy as a result of stenosis at C7-T1.

¶ 64    Dr. Chenelle also opined that defendant reasonably offered multilevel spine surgery to Philip given Philip's history of chronic neck pain and his report of weakness and pain after months of physical therapy and epidural steroid injections. He explained the potential for weakness to progress to a point where surgical action would no longer be beneficial. Based upon defendant's account of his discussion with Philip, Dr. Chenelle testified that defendant reasonably obtained informed consent for surgery.

¶ 65    Dr. Chenelle further opined that defendant appropriately performed the surgery and timely diagnosed and recommended appropriate treatment for the postsurgical complications. He explained that it was reasonable for defendant to have removed the amount of bone that he did.

Dr. Chenelle also opined that the construct failure is infrequent but does not mean that defendant did something wrong; constructs fail for unexplained reasons. Construct failure could occur because the bone is soft and "the implant starts to telescope into the vertebral body above and below"—pulling out screws. He also testified that postoperative weakness in the tricep muscles can happen without negligence. Dr. Chenelle further opined that defendant's postsurgical recommendations were reasonable, that Philip's condition at the April 22, 2013, follow-up examination did not constitute an emergency, and that a second surgery on the date would not have changed the outcome.

¶ 66                                c. Dr. Chetkovich

¶ 67      Dr. Chetkovich opined that Philip's symptoms at the time of his February 21, 2013, office visit with defendant were attributable to compression of nerves in his neck rather than an elbow problem. Dr. Chetkovich addressed the issue of Dr. Zhang's EMG and nerve conduction studies. He testified that Dr. Zhang's measurements with respect to Philip's elbow fell within the range of normal and that the nerve conduction study did not document an ulnar neuropathy. He explained that an EMG is performed by inserting a needle into the muscles of the hand and arm to look for signs of nerve injury. Dr. Chetkovich observed that the EMG was limited, as the needles were not placed in the muscles up and down Philip's neck. Thus, the EMG did not rule out a C8 radiculopathy given the failure to test the appropriate nerves.

¶ 68      Dr. Chetkovich opined that defendant reached the correct diagnosis of cervical radiculopathy. He observed the clinical absence of split sensation in the ring finger during the February 21, 2013, examination. With an ulnar neuropathy, 99% of the time, a split sensation finding is present. In addition, ulnar neuropathy does not cause neck pain to radiate down the arm or a change in symptoms by adjusting the neck. Dr. Chetkovich acknowledged that Philip had

never reported pain in the elbow or right hand before 2013, despite a long history of neck pain and degenerative changes. He also acknowledged that the EMG prior to the March 13, 2013, surgery did not show evidence of a C8 nerve root injury, but that a December 2013 EMG showed a C8 nerve root injury. Dr. Chetkovich recognized that follow-up testing could have been done.

¶ 69                    C. Jury Instruction Conference

¶ 70    At issue is the following damages instruction that plaintiffs tendered pursuant to Illinois Pattern Jury Instruction, Civil, No. 30.23 ("Injury from Subsequent Treatment") (hereinafter IPI Civil No. 30.23):

> "If a defendant negligently causes injury to the plaintiff, then the defendant is liable not only for the plaintiff's damages resulting from that injury but is also liable for any damages sustained by the plaintiff arising from the efforts of health care providers to treat the injury caused by the defendant even if those health care providers were negligent."

¶ 71    Following argument at the jury instruction conference, the trial court, citing the Comments to IPI Civil No. 30.23, refused the instruction in light of the absence of any testimony that the doctors who treated Philip after his March 13, 2013, surgery (Dr. Nockels and Dr. Bednar) caused or aggravated Philip's injuries.

¶ 72                         D. Jury Verdict

¶ 73    On January 24, 2020, the jury returned a general verdict in favor of defendant and against plaintiffs. The trial court entered judgment on the verdict that day.

¶ 74                           E. Posttrial

¶ 75    Plaintiffs timely filed a posttrial motion. They challenged, *inter alia*, the trial court's rulings on defendant's motion *in limine* Nos. 10 and 14 and the trial court's refusal to instruct the

jury in accordance with IPI Civil No. 30.23. Following briefing and argument, the trial court denied the posttrial motion in a July 16, 2020, memorandum of decision and order.

¶ 76    Regarding defendant's motion *in limine* No. 10, the trial court ruled that it properly barred Dr. Levin from testifying that defendant breached the standard of care by not consulting with an electrophysiologist or other physician regarding the EMG, as "[t]here simply was nothing which supported that the failure to consult caused or contributed to plaintiff's injuries." While plaintiffs argued that Dr. Allen supplied the causal link, the trial court noted that there was no Rule 213(f)(3) disclosure that Dr. Allen would testify as to what an electrophysiologist or other physician would say had defendant consulted; this was not an opinion noted in Dr. Allen's report; and Dr. Allen did not testify as to such an opinion in his discovery deposition. Thus, the trial court reasoned, "[f]rom a 213(f)(3) disclosure perspective, there was nothing the court could find or that was offered by plaintiff of a properly disclosed opinion of Dr. Allen as to what the electrophysiologist would have said if consulted or what, if any, relationship to injuries suffered by the plaintiff there may have been."

¶ 77    Addressing plaintiffs' reliance upon Dr. Allen's testimony at his evidence deposition, the trial court found that, in addition to the Rule 213(f)(3) disclosure violation, the testimony "at best [] goes to what his personal practice would hypothetically be if he was asked about a test he performed—he would tell them what was in the report." Dr. Allen's testimony "does not bridge the proximate cause gap of Dr. Levin's opinion." The trial court reasoned that, "[i]f anything, it actually confirms the lack of proximate cause for Dr. Levin's opinion because in this case, the testimony was that [defendant] had Dr. Zhang's report but strongly disagreed with it based on his physical exam and other information he possessed." Indeed, Dr. Allen acknowledged that he could not say whether the EMG was more reliable than the physical examination.

¶ 78 Regarding defendant's motion *in limine* No. 14, the trial court ruled that it had properly barred Dr. Allen from testifying that the March 13, 2013, surgery was a cause of Philip's dizziness, gait disturbances, and propensity to fall. The trial court observed that this opinion was not disclosed in plaintiffs' Rule 213(f)(3) disclosure or in Dr. Allen's report, and Dr. Allen did not testify to this opinion in his discovery deposition. Indeed, "Dr. Allen at no time was disclosed as having the opinion that Mr. Robinson had cervicogenic vertigo *as a proximate result of* the defendant Dr. Alexander's surgery nor were any bases for such an opinion so much as hinted at." (Emphasis in original.) While Dr. Allen mentioned cervicogenic vertigo in his discovery deposition, he did not opine that it was a condition that Philip had. Rather, the reference was to people who had feelings or sensations of loss of balance or instability, and "[n]othing about his exam findings tied to his comment about cervicogenic vertigo ***." Dr. Allen did not indicate any bases for his comment about cervicogenic vertigo. In sum, the trial court stated, "[t]here simply is no 'logical corollary' to the disclosed opinion of Dr. Allen." Thus, the mandatory disclosure requirements of Rule 213 were not met.

¶ 79 With respect to its refusal of plaintiffs' tendered jury instruction pursuant to IPI Civil No. 30.23, the trial court reasoned that the instruction was not warranted where "there was no evidence of nor argument regarding a subsequent provider aggravating the original injury, negligently treating the plaintiff or otherwise causing more damage to the plaintiff's original injury or any new damage in addition to it." The trial court added that the denial of the tendered instruction "in no way curtailed the plaintiff's ability to put in and argue both economic and non-economic damages nor for the jury to have awarded all damages sought should they have found in favor of the plaintiff."

¶ 80 Following the denial of their posttrial motion, plaintiffs timely appealed.

¶ 81                                    II. ANALYSIS

¶ 82    Plaintiffs first argue that the trial court erred by precluding certain testimony from their controlled expert witnesses. Namely, they contend that the trial court erroneously barred Dr. Levin from opining that defendant deviated from the standard of care by not consulting with Dr. Zhang (the neurologist who conducted the February 5, 2013, EMG) before rejecting the diagnosis of ulnar nerve entrapment. They also contend that the trial court erroneously barred Dr. Allen from opining that defendant's negligence caused Philip to suffer from dizziness, gait instability, and falls. Next, plaintiffs challenge the trial court's refusal to instruct the jury in accordance with IPI Civil No. 30.23. As a final matter, plaintiffs argue that, individually or cumulatively, the alleged errors require a new trial. We address each argument in turn.

¶ 83             A. Preclusion of Controlled Expert Witness Testimony

¶ 84    Supreme Court Rule 213(f)(3) requires parties, upon written interrogatory, to identify, *inter alia*, the subject matter on which a controlled expert witness will testify, the conclusions and opinions of the witness and the bases therefor, and any reports prepared by the witness about the case. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). The parties have a continuing duty to inform the opponent of new or additional information that becomes known to the party. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007). Rule 213(g) limits witness testimony at trial to the information disclosed in answer to a Rule 213(f) interrogatory or in a discovery deposition. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). Upon objection, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in a discovery deposition. *Id.* A party's Rule 213 disclosures must " 'drop down' to specifics." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). While an expert witness may elaborate upon a disclosed opinion, the testimony must state a "logical corollary" to the disclosed opinion, and not a new basis for the opinion. *Morrisroe v. Pantano*,

2016 IL App (1st) 143605, ¶ 37. In other words, the witness's testimony must be encompassed by the original opinion. *Id.*

¶ 85    Rule 213 disclosure requirements are mandatory and subject to strict compliance. *Sullivan*, 209 Ill. 2d at 109. The purpose of these discovery rules is " 'to avoid surprise and to discourage strategic gamesmanship.' " [Citation.] *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 33; see also Ill. S. Ct. R. 213(k), Committee Comments (rev. March 28, 2002) (stating, *inter alia*, that "[t]he application of this rule is intended to do substantial justice between the parties" and "is intended to be a shield to prevent unfair surprise but not a sword to prevent the admission of relevant evidence on the basis of technicalities").

¶ 86    A trial court's ruling on the admission of evidence is discretionary and will not be reversed absent an abuse of that discretion. *Sullivan*, 209 Ill. 2d at 109. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. Even if an abuse of discretion occurred, we will not reverse the judgment unless " 'the record indicates the existence of substantial prejudice affecting the outcome of the trial.' " *Guski v. Raja*, 409 Ill. App. 3d 686, 698 (2011) (quoting *In re Leona W.*, 228 Ill. 2d 439, 460 (2008)).

¶ 87    1. Preclusion of Dr. Levin's Testimony Regarding Deviation from Standard of Care

¶ 88    Plaintiffs argue that Dr. Levin was improperly precluded from opining that defendant should have consulted with Dr. Zhang, and ordered additional tests if the consultation failed to resolve defendant's concerns, before dismissing a diagnosis of ulnar nerve entrapment in favor of multilevel spinal surgery. According to plaintiffs, had defendant "held that consultation, a reasonably careful neurosurgeon would have performed a less invasive surgery, leading to recovery, not injuries." Defendant responds that the trial court properly barred Dr. Levin's opinion

because no expert witness opined that the alleged deviation from the standard of care proximately caused Philip's injuries. Moreover, defendant argues, plaintiffs suffered no prejudice from the exclusion of Dr. Levin's opinion, as the EMG findings were presented to the jury, and Dr. Levin testified regarding the diagnosis of ulnar nerve entrapment. As set forth below, a review of the record demonstrates that the trial court's preclusion of Dr. Levin's opinion was not an abuse of discretion. We therefore do not reach defendant's alternative argument that plaintiffs suffered no prejudice from the ruling.

¶ 89     Initially, plaintiffs contend that the trial court erred in finding a Rule 213(f)(3) disclosure violation. They argue that Dr. Levin's excluded opinion was a logical corollary "to his testimony that defendant deviated from the standard of care by not calling the neurologist to discuss the varying diagnoses." However, there was no challenge to the timely disclosure of Dr. Levin's opinion and no ruling by the trial court that his opinion was not disclosed. Rather, the issue was that Dr. Levin's disclosed opinion failed to link his criticism to Philip's injuries and was thus inadmissible. Plaintiffs relied upon *Dr. Allen's* testimony at both his discovery and evidence deposition to fill the proximate-cause gap. Of course, testimony at an evidence deposition would be too late, as Rule 213(g) limits witness testimony at trial to the information disclosed in answer to a Rule 213(f) interrogatory or in a discovery deposition. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). That was the point of the trial court's statement, in its order denying plaintiffs' posttrial motion, that there was a Rule 213(f)(3) disclosure violation with respect to Dr. Allen.

¶ 90     Plaintiffs nonetheless maintain that Dr. Allen's testimony at his evidence deposition was a logical corollary "to his other disclosed opinions." Plaintiffs do not identify the previously disclosed opinions to which they refer. Regardless, however, we hold that the trial court did not

abuse its discretion in determining that no expert testimony, timely or untimely, established a causal connection between the alleged deviation from the standard of care and Philip's injuries.

¶ 91    To prevail in a medical negligence action, a plaintiff must prove: (1) the standard of care against which the medical professional's conduct must be measured; (2) that the defendant was negligent by failing to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress. *Freeman v. Crays*, 2018 IL App (2d) 170169, ¶ 21. "The traditional statement of proximate cause requires plaintiff to prove that defendant's negligence 'more probably than not' caused plaintiff's injury." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997) (quoting *Borowski v. Von Solbring*, 60 Ill. 2d 418, 424 (1975)). Proximate cause must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible. *Freeman*, 2018 IL App (2d) 170169, ¶ 36.

¶ 92    In this regard, "[a]n expert opinion is only as valid as the reasons for the opinion. When there is no factual support for an expert's conclusions, the conclusions alone do not create a question of fact." *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974 (1997). Thus, "[w]hile testimony grounded in 'expert analysis of the known physical facts' is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant." *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293 (2008).

¶ 93    For instance, in *Aguilera*, the plaintiff presented expert testimony at trial from an emergency room physician and a neurologist that the decedent's emergency room physician deviated from the standard of care by failing to order an immediate CT scan and that an immediate CT scan would have allowed surgical intervention that may have saved the patient's life. *Aguilera*, 293 Ill. App. 3d at 969-70. However, the emergency room physician acknowledged that he would

have deferred to a neurosurgeon to determine the appropriateness of surgical intervention, and the neurologist acknowledged that he did not know whether surgical intervention would have been ordered had a prompt CT scan been administered. *Id.* Moreover, both testifying neurosurgeons agreed that, even with an earlier CT scan, surgery would not have been appropriate or ordered because the patient's bleed was deep within his brain. *Id.* at 975.

¶ 94 The appellate court affirmed the trial court's entry of judgment for defendant notwithstanding the verdict. *Id.* at 974-75. Noting the lack of a sufficient factual basis for the expert testimony, the court reasoned, "[t]he absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case." *Id.* at 975; see also *Wiedenbeck*, 385 Ill. App. 3d at 298-99 (expert testimony that an urgent-care doctor deviated from the standard of care by failing to order a CT scan failed to establish proximate cause where there was no expert testimony that an analysis of the CT scan would have led to earlier surgical intervention).

¶ 95 Likewise, here, the trial court was well within its discretion in finding Dr. Levin's opinion inadmissible. Plaintiffs state that they proffered Dr. Levin's opinion to establish the standard of care—"how a reasonably careful neurosurgeon should have acted." Dr. Levin testified at his discovery deposition regarding his opinion as to defendant's deviation from the standard of care by not consulting about the EMG. However, Dr. Levin explicitly acknowledged that he did not know what would have been said in the consultation: "How could I know that?" He testified that he would "absolutely" have to speculate on the subject. Moreover, Dr. Levin had no opinion as to what a repeat EMG would have shown. Accordingly, the trial court excluded Dr. Levin's opinion, finding no basis to support that the failure to consult regarding the EMG caused or contributed to

Philip's injuries. Given the conclusory and speculative nature of Dr. Levin's testimony, we cannot say that this ruling was an abuse of discretion. See *Aguilera*, 293 Ill. App. 3d at 974; *Wiedenbeck*, 385 Ill. App. 3d at 293.

¶ 96    Plaintiffs dispute that Dr. Levin's testimony was speculative, citing this court's unpublished decision in *Williams v. Rockford Health Physicians*, 2021 IL App (2d) 200353-U. The issue there was whether the plaintiff presented sufficient evidence to demonstrate a causal connection between the defendant pediatrician's failure to timely refer the patient to a pediatric gastroenterologist for an evaluation for chronic constipation. *Id.* ¶¶ 2-4. In reversing the trial court's entry of judgment for the defendant notwithstanding the verdict in the plaintiff's favor, we reasoned, *inter alia*, that the expert testimony presented by the plaintiff established to reasonable degree of medical certainty that, had the referral occurred, it would have led to a diagnosis of Hirschsprung's disease and prompted the necessary surgical intervention to occur years earlier. *Id.* ¶ 91. Here, however, there was no such comparable expert testimony presented. To the contrary, Dr. Levin explicitly acknowledged that he did not know what would have been said in the consultation and would have to speculate on the subject. Accordingly, *Williams* is inapposite.

¶ 97    Equally unavailing is plaintiffs' reliance upon the dissenting opinion in *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7 (1999). *Seef* was a medical malpractice action in which the plaintiffs sued a doctor and hospital for the wrongful death of their stillborn child. *Seef*, 311 Ill. App. 3d at 9-10. The trial court granted the hospital's motion *in limine* to bar expert testimony that the hospital nurses deviated from the standard of care by failing to advise the doctor of the fetal monitoring results and subsequently dismissed the hospital on the basis of that ruling. *Id.* at 11-12. The appellate court affirmed, reasoning that the proffered expert testimony was speculative and inadequate to establish proximate cause where the doctor testified that he would not have done

anything differently had the nurses informed him of the fetal monitoring results. *Id.* at 15-17. The dissenting Justice reasoned that it was error to remove the decision as to causation from the jury where the plaintiffs introduced expert testimony regarding the nurses' deviation from the standard of care as well as expert testimony that the deviations were a proximate cause of the child's death. *Id.* at 26-27 (O'Mara Frossard, P.J., dissenting). The dissenting Justice disagreed that the doctor's testimony broke the causal link between the nurses' deviations and the child's death. *Id.* at 28 (O'Mara Frossard, P.J., dissenting). This opinion is not helpful to plaintiffs because a causal link between the failure to consult and Philip's injuries was never established in the first instance.

¶ 98   Plaintiffs nevertheless argue that Dr. Allen's testimony bridged any proximate-cause gap in Dr. Levin's testimony. At his discovery deposition, Dr. Allen testified about the reliability of EMGs and the findings with respect to the February 5, 2013, EMGs. He offered no opinion, however, as to what would have been said or recommended had a consultation about the EMG occurred. At his evidence deposition, plaintiffs' counsel questioned Dr. Allen as to whether he has had the occasion, as a neurologist "involved with EMGs over the years in your career," to answer an ordering physician's questions about his EMG interpretations. Over defendant's Rule 213 objection, Dr. Allen responded affirmatively and explained:

> "If I were performing the test and I was asked for my interpretation, I would just simply tell them what I said in the report. If they asked me what it meant, I would provide an interpretation of what it meant, I would provide an interpretation of what it means. If I examined the patient and I read the report, I would give them my interpretation of both my examination as well as my report, my review of the report."

¶ 99   The trial court found this testimony insufficient to establish the causal connection missing from Dr. Levin's opinion. Rather, the trial court found, "at best," Dr. Allen's testimony amounted

to inadmissible personal-practice testimony. "Personal-practice testimony is testimony by a medical expert concerning how he himself typically performs the treatment at issue." *Swift v. Schleicher*, 2017 IL App (2d) 170218, ¶ 81. Such testimony is "not universally admissible." *Id.* "Rather, personal-practice testimony is admissible if it is relevant to the credibility of an expert testifying to the standard of care or, in limited instances, if it affirmatively elucidates the expert's opinion of the standard of care." *Id.* Stated otherwise, personal-practice testimony is relevant for the purpose of impeachment when the expert's own personal practice is inconsistent with the expert's proffered standard-of-care testimony. *Id.* ¶ 83.

¶ 100 Plaintiffs dispute the characterization of Dr. Allen's testimony as personal-practice testimony. Plaintiffs state that Dr. Allen "was not even giving an opinion." Rather, he "was talking about a fact." Fact testimony of an expert pertains to the expert's personal knowledge of the facts themselves, as opposed to what the expert thinks, believes, or infers with respect to the disputed facts. *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 577 (2001). Dr. Allen's testimony did not involve his personal knowledge of the facts. Rather, he answered the hypothetical question posed as to what he would do if he were "performing the test" and "asked for my interpretation." Dr. Allen explained that his practice would be to provide an interpretation of the examination and report. This is quintessential personal-practice testimony "concerning how he himself typically performs" with respect to EMG interpretations. See *Swift*, 2017 IL App (2d) 170218, ¶ 81.

¶ 101 Plaintiffs also contend that Dr. Allen's "proffered testimony would have addressed Dr. Levin's credibility and the persuasiveness of his testimony." It is unclear how *Dr. Allen's* testimony regarding his personal practice would address *Dr. Levin's* credibility or persuasiveness. Moreover, Dr. Allen's testimony would not have been relevant for impeachment purposes where

the testimony was not offered to show an inconsistency between Dr. Allen's own personal practice and his opinion testimony. See *Swift*, 2017 IL App (2d) 170218, ¶ 83. In other words, Dr. Allen did not testify to a standard of care that he did not emulate in his personal practice. Nor did his testimony affirmatively elucidate his opinion on the standard of care. Accordingly, the trial court was well within its discretion in finding that Dr. Allen's testimony amounted to inadmissible personal-practice testimony.

¶ 102   Moreover, the trial court found that, even if Dr. Allen's testimony were admissible, the testimony failed to bridge the proximate-cause gap of Dr. Levin's opinion. Dr. Allen testified that he "would simply tell them what [he] said in the report" and "provide an interpretation." However, the trial court pointed out, defendant had Dr. Zhang's report but disagreed with it based on his physical examination and other information. Dr. Allen acknowledged that he could not say whether the EMG was more reliable than the physical examination. Thus, the trial court reasoned, if anything, Dr. Allen's testimony confirmed the lack of proximate cause for Dr. Levin's opinion. Based upon our review of the record, we cannot say that this determination was an abuse of discretion.

¶ 103   In sum, plaintiffs failed to disclose an expert opinion linking the alleged consultation deviation set forth in Dr. Levin's opinion to Philip's injuries. Absent a showing that a deviation from the standard of care proximately caused the plaintiff's injuries, expert testimony regarding the deviation is not relevant and thus properly excluded. See *Biundo v. Bolton*, 2020 IL App (1st) 191970, ¶ 30 (no abuse of discretion in excluding expert's opinion that the defendants deviated from the standard of care by discharging the patient without first obtaining a psychiatric evaluation where the expert conceded that he could only speculate as to the outcome of the evaluation and thus the foundation to opine on proximate cause was lacking); *Guski*, 409 Ill. App. 3d at 701-02

(no abuse of discretion in excluding expert's opinion on charting deficiencies where there was no evidence that a failure to chart caused the patient's death). Accordingly, the trial court did not abuse its discretion in precluding Dr. Levin from testifying that defendant deviated from the standard of care by not consulting regarding the EMG.

¶ 104    2. Preclusion of Dr. Allen's Testimony Regarding Undisclosed Opinion

¶ 105   Plaintiffs argue that the trial court abused its discretion in barring Dr. Allen from testifying that defendant's negligence caused Philip to experience dizziness, gait instability, or a propensity to fall. According to plaintiffs, Dr. Allen should have been allowed to testify at trial that Philip's issues could have been caused by cervicogenic vertigo as a result of the March 13, 2013, surgery. Defendant argues that the trial court properly barred the testimony on the ground that it was not disclosed in discovery and thus inadmissible pursuant to Rule 213(g). Moreover, defendant argues, plaintiffs cannot establish prejudice from the preclusion of Dr. Allen's testimony because the jury never reached the issue of damages, as demonstrated by its general verdict in defendant's favor. See *Dabros v. Wang*, 243 Ill. App. 3d 259, 269 (1993) (where a defendant is found not liable, alleged error pertaining to damages does not afford grounds for reversal). As set forth below, a review of the record demonstrates that the trial court's preclusion of Dr. Allen's testimony was not an abuse of discretion. We therefore need not address defendant's argument that plaintiffs suffered no prejudice from the ruling.

¶ 106   Initially, plaintiffs posit that Dr. Allen's opinion was in fact affirmatively disclosed in discovery. They cite the notation in Dr. Allen's March 9, 2017, report regarding Philip's account of dizziness and falling and Dr. Allen's testimony at his discovery deposition that dizziness could be attributable to cervicogenic vertigo, and not to a nerve root injury. According to plaintiffs, "[e]veryone knew that Philip suffered from dizziness, gait problems and falls," and Dr. Allen

"simply tried to explain why Philip had this problem." This argument fails to acknowledge that Dr. Allen's proffered explanation—his opinion that Philip's "problem" could be attributable to cervicogenic vertigo as a result of the March 13, 2013, surgery—was not disclosed in discovery, as reflected by a review of Dr. Allen's report and discovery deposition testimony. Rather, he proffered this opinion for the first time at his evidence deposition—six days before trial.

¶ 107 It was undisputed that Dr. Allen never observed Philip in a state of dizziness, gait instability, or falling, and never diagnosed Philip with cervicogenic vertigo. In his discovery deposition, Dr. Allen discussed cervicogenic vertigo generally and explained that the condition is "seen in people who have feelings and perceptions of loss of balance or instability who have neck problems because of what's known as the tectospinal pathway ***." This general information did not satisfy Rule 213(f)(3)'s disclosure requirements. See *Northern League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP*, 2018 IL App (1st) 172407, ¶ 52 (general statements and catch-all phrases unconnected to a specific opinion generally do not comply with Rule 213's disclosure requirements). Dr. Allen was never disclosed in discovery as having the opinion that cervicogenic vertigo caused Philip's problem, that the condition was a proximate result of the March 13, 2013, surgery, or that defendant's negligence caused Philip to experience dizziness, gait instability, or a propensity to fall. As the trial court concluded, Dr. Allen never diagnosed Philip with cervicogenic vertigo, and, moreover, "Dr. Allen at no time was disclosed as having the opinion that Mr. Robinson had cervicogenic vertigo *as a proximate result of* the defendant Dr. Alexander's surgery nor were any bases for such an opinion so much as hinted at" and "[n]othing about his exam findings tied to his comment about cervicogenic vertigo ***." (Emphasis in original.) A party's Rule 213 disclosures must " 'drop down' to specifics." *Sullivan*, 209 Ill. 2d at 109. There was no such specificity here.

¶ 108 Plaintiffs nevertheless argue that Dr. Allen's opinion about the cause of Philip's dizziness, gait problems, and falls was a logical corollary of "earlier disclosures." Plaintiffs again rely upon the reports of Philip's dizziness, gait instability, and propensity to fall; Dr. Allen's general discussion of cervicogenic vertigo at his discovery deposition; and Dr. Allen's testimony that dizziness could be attributable to cervicogenic vertigo.

¶ 109 As discussed, while an expert witness may elaborate upon a previously disclosed opinion at trial, the testimony must be encompassed by the original opinion, or state a logical corollary to the original opinion, and not a new basis for the opinion. Compare *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 645-46 (2007) (expert witness's opinion at trial that injury occurred "at least an hour before the delivery" introduced a new theory where the expert had merely opined in his discovery deposition that the injury occurred "during the intrapartum period"), and *Prairie*, 324 Ill. App. 3d at 576-77 (the defendant physician's opinion at trial that the standard of care required that the patient be "assessed" three times daily was not encompassed by his pretrial disclosure that the patient's "vital signs were to be taken" three times daily) with *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812-13 (2009) (expert witness's opinion at trial regarding his interpretation of CT scans was an elaboration on, or a logical corollary to, the witness's previously disclosed opinion that was based upon "all the relevant medical records and diagnostic studies").

¶ 110 Here, as in *Lopez* and *Prairie*, the opinion advanced by Dr. Allen for the first time in his evidence deposition about the cause of Philip's dizziness, gait problems, and falls presented a new theory (here a new damages theory) and was not encompassed by his pretrial disclosures. To the contrary, Dr. Allen testified for the first time at his evidence deposition that Philip "might or could have cervicogenic vertigo as a result of the cervical procedure that disrupted the stability of the

cervical spine during the procedure of March and the subsequent procedure by Dr. Nockels in 2013." This opinion marked a considerable addition to the opinions on causation and injuries set forth in his March 9, 2017, report and about which he testified in his discovery deposition, including his general discussion of cervicogenic vertigo and its attributions. In sum, plaintiffs failed to establish that Dr. Allen's opinion about the cause of Philip's dizziness, gait problems, and falls was a logical corollary to a previously disclosed opinion. Rule 213 disclosure requirements are mandatory and subject to strict compliance. *Sullivan*, 209 Ill. 2d at 109. Accordingly, we cannot say that the trial court's preclusion of Dr. Allen's testimony was arbitrary, fanciful, or unreasonable, or that no reasonable person would take the trial court's view. See *Seymour*, 2015 IL 118432, ¶ 41.

¶ 111 Notwithstanding, plaintiffs contend that the trial court's "concerns" regarding the insufficiency of the disclosure of Dr. Allen's opinion "should have been addressed through vigorous cross-examination." This argument ignores the underlying purposes of Rule 213's requirements—to avoid surprise and discourage strategic gamesmanship. See *Wilson*, 2019 IL App (1st) 173065, ¶ 33; Ill. S. Ct. R. 213(k), Committee Comments (rev. March 28, 2002). As we reasoned in *Prairie* in rejecting the argument that failure to impeach a witness when the witness offers an undisclosed opinion forfeits a Rule 213 objection, "[t]his rule would eviscerate Rule 213," as "[t]he proponent of an opinion would be free to disregard the rule, knowing that the only sanction for a violation would be the possibility of impeachment." *Prairie*, 324 Ill. App. 3d at 579. The trial court's preclusion of Dr. Allen's opinion was not an abuse of discretion.

¶ 112                           B. IPI Civil No. 30.23

¶ 113 Plaintiffs argue that the trial court erroneously refused to instruct the jury in accordance with IPI Civil No. 30.23. As discussed, plaintiffs' tendered instruction provided:

"If a defendant negligently causes injury to the plaintiff, then the defendant is liable not only for the plaintiff's damages resulting from that injury but is also liable for any damages sustained by the plaintiff arising from the efforts of health care providers to treat the injury caused by the defendant even if those health care providers were negligent."

¶ 114    A party has the "right to have the jury instructed on his or her theory of the case if the facts in evidence or a reasonable inference from those facts supports the theory." *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 377 (2000). The trial court's determination of which instructions to give the jury is reviewed for an abuse of discretion. *Schultz v. Northeast Illinois Regional Commuter Railroad Corp.*, 201 Ill. 2d 260, 273 (2002). "The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Id.* at 273-74.

¶ 115    Initially, defendant argues that plaintiffs forfeited their argument by failing to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (an argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). Specifically, according to defendants, plaintiffs violate Rule 341(h)(7) by advancing an "abbreviated, three-sentence description of the claimed basis for the instruction, without specific citation or even a reference to the trial testimony" and failing to cite case law addressing IPI Civil No. 30.23—the consequence of which should be forfeiture of the issue on appeal. See *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("Mere contentions, without argument or citation to authority, do not merit consideration on appeal."). Although we agree that plaintiffs advance a perfunctory analysis of the issue, the deficiencies to which defendant cites are not "so flagrant as to hinder or preclude review." (Internal quotation

marks omitted.) See *Carter v. Carter*, 2012 IL App (1st) 110855, ¶ 12. We therefore decline to deem plaintiffs' argument forfeited. See *id.*

¶ 116 Defendant also argues that the propriety of the trial court's refusal to instruct the jury in accordance with IPI Civil No. 30.23 is merely "academic" because plaintiff cannot establish that the refusal of the instruction impacted the verdict. According to defendant, the instruction prompts a jury to consider the issue of damages caused by subsequent healthcare providers only if it finds that the defendant negligently caused injury to the plaintiff. Here, the jury returned a verdict in defendant's favor; thus, defendant argues, the jury never reached the issue of damages. Indeed, defendant points out, the jury was instructed that "[i]f you decide for the defendant on the question of liability, you will have no occasion to consider the question of damages as to the defendant." See Illinois Pattern Jury Instruction, Civil, No. 36.01 ("In Absence of Liability—No Occasion to Consider Damages").

¶ 117 Plaintiffs respond that the same argument was rejected by the appellate court in *Beard v. Barron*, 379 Ill. App. 3d 1 (2008). There, the plaintiff maintained her challenge to the erroneous refusal of her tendered instruction pursuant to IPI Civil No. 30.23, notwithstanding the jury's verdict for the defendants. *Id.* at 18. The plaintiff argued that the instruction was not strictly a damages instruction and that the failure to give the instruction may have led to juror confusion as to the applicable law. *Id.* The appellate court agreed and addressed (although ultimately rejected) the merits of the plaintiff's argument, reasoning that the Comments to IPI Civil No. 30.23 "support the plaintiff's position that the instruction may have an impact on a jury beyond damages because [a] jury might perceive the subsequent provider as the wrongdoer and acquit[] the defendant on that basis." (Internal quotation marks omitted.) *Id.* Likewise, here, we address, but reject, the merits of plaintiffs' argument.

¶ 118  Plaintiffs argue that the trial court erroneously refused their tendered instruction. According to plaintiffs, the trial court rejected the instruction on the ground that there was no evidence that the doctors who treated Philip after his March 13, 2013, surgery were negligent. However, plaintiffs contend, regardless of whether the subsequent treaters (Dr. Nockels and Dr. Bednar) were negligent, the evidence established that their efforts to treat Philip resulted in further damages. Thus, plaintiffs contend that they were entitled to the tendered instruction. Defendants respond that IPI Civil No. 30.23 was not warranted in light of the absence of evidence that the subsequent treaters caused or aggravated Philip's injuries.

¶ 119  Plaintiffs' argument rests upon a faulty premise—that the trial court refused the tendered jury instruction on the ground that there was no evidence that Philip's subsequent treaters were negligent. A review of the record demonstrates that this was not the basis for the trial court's ruling. Rather, both at the jury instruction conference and in its order denying plaintiffs' posttrial motion, the trial court reasoned that the instruction was not warranted in the absence of any evidence that Dr. Nockels or Dr. Bednar caused or aggravated Philip's injuries.

¶ 120  The Notes on Use to IPI Civil No. 30.23 are illustrative of this distinction in providing that the "instruction is intended to be used when there is evidence that a subsequent health care provider caused or aggravated the injury" and that the "last bracketed material [even if (that) (those) health care provider(s) (was) (were) negligent] should be used when there is a claim that the subsequent health care provider was negligent." IPI Civil No. 30.23, Notes on Use. Here, plaintiffs' tendered instruction included the bracketed material, although at the jury instruction conference, plaintiffs' counsel assented: "I'm fine with crossing out the 'even if those health providers were negligent,' because there is no evidence that's been submitted in this case that anybody was negligent. But we are entitled to the first part of this instruction under the law and the evidence in this case." The

trial court responded: "Based on the committee comments, you're not." The trial court proceeded to point out the absence of evidence that the subsequent treaters caused or aggravated Philip's injuries. Accordingly, the trial court refused the tendered instruction. A review of the record demonstrates that the trial court's ruling was not an abuse its discretion.

¶ 121   In addition to the Notes on use, the Comments to IPI Civil No. 30.23 provide: "If the issue of the subsequent medical provider having caused or aggravated an injury is injected into the case, there is a likelihood the jury may be confused as to the applicable law. The jury might perceive the subsequent provider as the wrongdoer and 'acquit[] the defendants on that basis.' " IPI Civil No. 30.23, Comments (quoting *Kolakowski v. Voris*, 94 Ill. App. 3d 404, 413 (1981)). The Comments continue: "This proposition is not necessarily obvious and should be told to the jury" (see *Daly v. Carmean*, 210 Ill. App. 3d 19, 30 (1991) (citing *Gertz v. Campbell*, 55 Ill. 2d 84, 90 (1973))), as "[n]o other instruction tells the jury that the defendant, if culpable, is liable for damages caused by the subsequent health care provider's conduct." IPI Civil No. 30.23, Comments.

¶ 122   However, the instruction is not warranted in the absence of evidence that the subsequent health care provider caused or aggravated the injury. IPI Civil No. 30.23, Notes on Use. Our supreme court's decision in *Holton* is instructive. *Holton*, 176 Ill. 2d at 131-32. In addressing the "loss-of-chance" doctrine in medical malpractice cases (which "refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff"), the court in *Holton* held that traditional principles of proximate cause are satisfied by the loss-of-chance concept. *Id.* at 111, 119-20. In remanding for a new trial, the court in *Holton* also addressed

the propriety of the following instruction proposed by the plaintiff (prior to the implementation of IPI Civil No. 30.23):

"If a health care provider is guilty of professional negligence which creates a condition of the plaintiff's body, then the health care provider is liable not only for plaintiff's damages resulting from that condition, but also liable for any damages sustained by the plaintiff arising from the efforts of subsequent health care providers to treat the condition caused by the initial health care provider." *Id.* at 131.

¶ 123   The court held that the facts of the case did not support "the giving of an instruction involving the aggravation of an original tortfeasor's injury by subsequent medical malpractice." *Id.* at 132. In doing so, the court distinguished *Gertz* and *Daly*, which involved circumstances "where an initial tortfeasor was legally responsible for subsequent aggravation of the original injury caused by the initial tortfeasor." *Id.* (citing *Gertz*, 55 Ill. 2d 84; *Daly*, 210 Ill. App. 3d 19); see also *Beard*, 379 Ill. App. 3d at 18-19 (holding that the trial court properly rejected the plaintiff's tendered instruction pursuant to IPI Civil No. 30.23 where there was no evidence of subsequent treatment causing or aggravating an injury or of subsequent medical negligence).

¶ 124   Plaintiffs acknowledge that the subsequent treating physicians "did not *cause* any injuries" but assert that they "*aggravated* the previous injuries by causing Philip addition pain and suffering, disability, and scarring" and that "their efforts to treat Philip for his injuries caused by the defendant caused him to sustain damages." (Emphasis in original.) Plaintiffs, however, provide no supporting record citation. Rather, they assert that the extensive nature of the subsequent surgeries and the resulting additional pain and suffering were undisputed.

¶ 125   Plaintiffs' assertion circumvents the issue. As the trial court noted, the denial of the tendered instruction "in no way curtailed the plaintiff's ability to put in and argue both economic

and non-economic damages nor for the jury to have awarded all damages sought should they have found in favor of the plaintiff." The point here is that there were no facts to support instruction of the jury pursuant to IPI Civil No. 30.23. Thus, as the Notes on Use to IPI Civil No. 30.23 elucidate, the instruction was not warranted: "This instruction is intended to be used when there is evidence that a subsequent health care provider caused or aggravated the injury." Plaintiffs cite to no evidence that Dr. Nockels or Dr. Bednar caused or aggravated Philip's injuries. To the contrary, defendant acknowledged that Dr. Nockels took a reasonable approach in his surgery. And plaintiffs' counsel argued in closing that Dr. Nockels "did a wonderful job of saving [Philip's] spinal cord and his nerve roots from any further damage" and that Dr. Bednar improved Philip's hand function with a tendon transfer. In the absence of any evidence that the subsequent health care providers caused or aggravated Philip's injury, the trial court did not abuse its discretion in refusing plaintiffs' proposed jury instruction pursuant to IPI Civil No. 30.23.

¶ 126                          C. Lack of Error or Cumulative Error

¶ 127   As a final matter, plaintiffs argue that the purported evidentiary and instructional errors therefore "cumulatively require a new trial" given the "close" nature of the case. However, as discussed, we find no error. We therefore necessarily find no cumulative error. See *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶ 127. Accordingly, we reject plaintiffs' argument.

¶ 128                              III. CONCLUSION

¶ 129   For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 130   Affirmed.